**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF CONNECTICUT**

------------------------------------------------------------------x

| | |
|---|---|
| ML FASHION, LLC and ML RETAIL, LLC, | Case No. _____ |
| Plaintiffs, | COMPLAINT |
| v. | JURY DEMAND |
| NOBELLE GW, LLC, STEPHANIE MENKIN, SARIT MAMAN NAGRANI, and NICOLAS GOUREAU, | |
| Defendants. | |

------------------------------------------------------------------x

## COMPLAINT

Plaintiffs ML Fashion, LLC ("ML Fashion") and ML Retail, LLC ("ML Retail") (collectively, "Plaintiffs"), by their undersigned attorneys, as and for their Complaint (the "Complaint") against Defendants Nobelle GW, LLC ("Nobelle"), Stephanie Menkin ("Menkin"), Sarit Maman Nagrani ("Nagrani"), and Nicolas Goureau ("Goureau") (collectively, "Defendants"), alleges as follows:

## NATURE OF THE ACTION

1.      This is an action for conversion, breach of fiduciary duty, breach of contract, tortious interference, fraud, violations of the Lanham Act, Defend Trade Secrets Act, and Computer Fraud and Abuse Act, as well as a request for a preliminary and permanent injunction. Plaintiff ML Fashion operates a retail clothing business, while Plaintiff ML Retail is one of three members of ML Fashion and a party to the governing LLC agreement. Defendants Menkin and Goureau are also members and/or officers of Plaintiff ML Fashion. Defendant Nagrani is a former employee of ML Fashion.

2.     In violation of their fiduciary duties, applicable law, and/or contractual obligations to Plaintiffs, Defendants have illegally seized computers, fixtures, clothing and other inventory owned by ML Fashion; opened up a retail store called Nobelle in direct competition with ML Fashion at a property formerly operated by ML Fashion, at which Defendants have no right to operate; and are selling ML Fashion's inventory at that competing retail store for Defendants' own benefit, all the while jeopardizing the jobs of ML Fashion's part-time and full time employees, the continuing viability of ML Fashion and depleting collateral for loans made to ML Fashion by ML Retail allowing it to operate.

3.     Worse still, inexplicably Defendants conducted this scheme and continuing misconduct while Menkin and Goureau *themselves* brought unsupported claims against ML Retail and ML Fashion in two lawsuits in Delaware and New York to divert attention from their own misconduct, one of which has since been stayed due to Defendants' violation of the prohibition against claim splitting.  Plaintiffs are entitled to protect the jobs of their employees, protect ML Retail's collateral, protect the on-going business, seek the return of their property, recover damages, and obtain injunctive relief to prevent Defendants continued improper sale of ML Fashion's inventory and operation of a competing retail business.

## PARTIES

4.     Plaintiff ML Fashion is a limited liability company organized under the laws of Delaware with its principal place of business in Illinois.  Plaintiff owns and operates fashion brands and retail stores across the country.

5.     Plaintiff ML Retail is a limited liability company organized under the laws of Delaware with its principal place of business in Illinois.  ML Retail owns a 33.34% membership interest in ML Fashion.  The sole member of ML Retail is Marcus Lemonis, a citizen of Illinois.

6.     Defendant Nobelle GW, LLC is a limited liability company organized under the laws of New York with its principal place of business in Connecticut.

7.     Defendant Stephanie Menkin is an individual residing in New York.  Menkin owns a 33.33% membership interest in, and is an officer of, ML Fashion.

8.     Defendant Sarit Maman Nagrani is an individual residing in Hewlett, New York, Nassau County.  On information and belief, Defendant Nagrani is a founder and co-owner of Nobelle along with Defendant Menkin.

9.     Defendant Nicolas Goureau is an individual residing in Florida.  Goureau owns a 33.33% membership interest in ML Fashion.

## JURISDICTION AND VENUE

10.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331, and over the state law claims pursuant to ancillary, pendent and supplemental jurisdiction, including under 28 U.S.C. § 1367.

11.     This Court has personal jurisdiction over Defendants by reason of, among other things, their systematic and continuous contacts with this forum in the form of Defendants' operation of an illegal, improper competitive enterprise in Greenwich, Connecticut, their sales of stolen inventory in Greenwich, Connecticut, their use of stolen fixtures, furniture, and equipment in Greenwich, Connecticut, and their promoting and advertising in interstate commerce via the Internet their illegal, improper retail store in Greenwich, Connecticut.

12.     Venue is proper in this District under 28 U.S.C. § 1391(a) and because: (1) a substantial part of the events giving rise to the claims occurred in the District of Connecticut; and (2) Defendants are otherwise subject to personal jurisdiction in this venue.

**FACTS**

**A.   Background.**

13.     In or about 2014, Defendants Menkin and Goureau solicited an investment from Marcus Lemonis ("Lemonis") to rescue their failing fashion retail business, operating under the brand name "Courage.B."

14.     In connection with their solicitation of an investment from Lemonis to rescue their business, in or about 2014, Defendants Menkin and Goureau appeared on Lemonis' popular CNBC television series, "The Profit."

15.     While appearing on "The Profit," Defendants Menkin and Goureau admitted that their business had been poorly run and had lost more than $500,00 the year before and that they just completed a lawsuit against their step-father involving the business.

16.     In or about 2014, Lemonis agreed to invest $800,000 in Menkin's and Goureau's failing business in order to allow their business to purchase inventory, pay other fees and for Goureau to receive monies for the first time in exchange for ML Retail, for which Lemonis serves as managing member, receiving an ownership stake in that business.

17.     After Lemonis invested in, and became a part owner of, Menkin and Goureau's business, the business acquired new brands and opened new stores.

18.     In or about 2016, Menkin, Goureau, and Plaintiff ML Retail formed ML Fashion to oversee and operate their expanding fashion retail business.

19.     ML Fashion advertises and sells its products in interstate commerce.

20.     Lemonis is ML Fashion's managing member.

**B.**     **The Agreements.**

21.     On or about March 29, 2016, Menkin, Goureau, and ML Retail entered into a limited liability company agreement for ML Fashion (the "LLC Agreement") (attached hereto as **Exhibit 1** to the Complaint).  Menkin and Goureau each signed the LLC Agreement individually.

22.     Lemonis signed the LLC Agreement on behalf of ML Retail in Illinois.

23.     **Exhibit A** of the LLC Agreement provides that ML Retail owned a 33.34% membership interest in ML Fashion, and that Menkin and Goureau each owned a 33.33% membership interest in ML Fashion.

24.     **Exhibit B** of the LLC Agreement provides that Lemonis is the chairman and CEO of ML Fashion, and that Menkin serves as ML Fashion's president.

25.     Section 2.3 of the LLC Agreement provides that "[t]he purpose of the Company is to, directly or indirectly through one or more partnerships, limited liability companies or other entities, acquire, hold, maintain, manage, improve, finance, sell, dispose of or otherwise invest in businesses focused on the distribution and sale of apparel, footwear and accessories and sale of apparel, footwear and accessories, via owned and leased retail stores and online (the 'Business')."

26.     Section 2.7 of the LLC Agreement provides that ML Fashion holds title to all of its property, and that no member of ML Fashion has an ownership interest in ML Fashion's property.

27.     Section 6 of the LLC Agreement provides that the management of ML Fashion is "vested entirely and exclusively in" the manager of ML Fashion (the "Manager").

28.     Section 6.1(b) of the LLC Agreement provides that the Manager of ML Fashion is Marcus Lemonis.

29.     Section 7.1 of the LLC Agreement provides that ML Fashion's members do not have any right to participate in the management or control of ML Fashion, or to act for or bind ML Fashion in any way.

30.     Section 7.7(b) of the LLC Agreement provides that the members of ML Fashion, including Menkin and Goureau, during the time that they are members and in the twelve months following the end of their membership in ML Fashion, shall not, *inter alia*, "engage in any business, have any financial interest in any company or entity that engages in any business or make any loans to any company or entity that engages in any business that engages in or competes, directly or indirectly, with" ML Fashion's business.

31.     Section 7.7(d) of the LLC Agreement provides that the members of ML Fashion, including Menkin and Goureau, agree that breaches of Section 7.7(b) of the LLC Agreement "would be highly injurious and cause irreparable harm" to ML Fashion, and that ML Fashion is accordingly entitled to seek specific performance or injunctive relief as a result of any such breaches.

**C.     ML Fashion's business expansion.**

32.     Beginning in or about 2016, ML Fashion began its business operations and took its first planned step toward their eventual goal of opening retail stores across the country.

33.     Menkin and Goureau opened ML Fashion's first store in their desired location of Lake Forest, Illinois.

34.     At one point, ML Fashion operated more than thirty other retail stores across the country in California, Colorado, Connecticut, Florida, Louisiana, Maryland, Massachusetts, Minnesota, New York, South Carolina, and Texas.

35.     In particular, ML Fashion opened and operated a "MARCUS" store at 85 Greenwich Avenue, Greenwich, Connecticut (the "Greenwich Property").

36.     Nagrani was the manager of the Greenwich Property, in addition to the manager of an additional ML Fashion store in New York City's Meatpacking District located at 402 W. 13th Street, New York, New York 10014 (the "Meatpacking Store").

37.     New York and Greenwich are in the same retail market, both because of their physical proximity, but also because many people who live in Greenwich work in, or frequently travel to, New York City.

38.     Many Greenwich residents do their fashion-related shopping in both Greenwich and New York City.

39.     Menkin, Goureau, and Nagrani viewed New York City and Greenwich as being in the same retail market.  Menkin's and Goureau's prior business enterprise, "Courage.B," maintained stores in both Greenwich and New York City for that very reason.

40.     Nagrani, Menkin and Goureau accordingly wanted to establish a store at the Greenwich Property to serve both markets.  Nagrani and other ML Fashion employees often travelled back and forth between Greenwich and New York.

41.     Due to the impact of the COVID-19 pandemic on the brick-and-mortar retail market in New York City, ML Fashion closed its New York City store on or about December 22, 2020. ML Fashion has not relinquished that space to its landlord, however.

42.     ML Fashion sold clothing and other fashion-related retail products at the Greenwich Property until in or about March 2020.

43.     ML Fashion remains the owner of the fixtures, furniture, and equipment ("FFE") in the Greenwich Property and remains the owner of the leasehold on the Greenwich Property.

44.     ML Fashion never advised its landlord at the Greenwich Property or anyone else that it was "abandoning" the FFE in the Greenwich Property, which ML Fashion owns and which it always intended to remove from the Greenwich Property.

45.     ML Fashion intended to retrieve the FFE from the Greenwich Property, but was prevented from doing so when Goureau threatened the ML Fashion employee overseeing the FFE

removal via phone calls, to the point where that employee felt uncomfortable returning to the Greenwich Property.

46.     ML Fashion has never turned in its keys to the landlord of the Greenwich Property and its the lease was never terminated.

47.     ML Fashion has not authorized anyone else to operate at the Greenwich Property.

48.     Although ML Fashion's landlord is not currently demanding rent, ML Fashion has no way of knowing whether the landlord is continuing to accrue rent under ML Fashion's name even while Nobelle is operating at the property.

49.     The FFE at the Greenwich Property is collateral for a multi-million dollar loan between ML Retail and ML Fashion.

50.     At its retail stores and online website, ML Fashion sells products from private-label, exclusive brand names owned by ML Fashion, such as a.M, Brkn Heart, and The Line:



51.     ML Fashion also sells products from third-party brands such as Ankle Traveler, Autumn Cashmere, and Brochu Walker.

**D.     Defendants' fraudulent misrepresentations and misappropriation of company funds.**

52.     Although Lemonis had ultimate management authority over ML Fashion, Menkin and Goureau both had active roles in the management and operations of ML Fashion.

53.     Menkin was for years ML Fashion's president.  In that capacity, she oversaw and managed ML Fashion's retail operations and other endeavors.

54.     Goureau too worked for ML Fashion, overseeing the build-out of ML Fashion stores at one point, and worked for other affiliated entities that assisted ML Fashion's operations.

55.     In other words, Menkin and Goureau were never passive members of ML Fashion who just sat back and collected distribution checks; they were involved in managing and operating ML Fashion's business under Lemonis' direction and subject to his ultimate managerial authority.

56.     In or about early 2020, Lemonis began discussions with Menkin and Goureau about their exit from ML Fashion.  Lemonis and Menkin proposed that Menkin would exchange all of her equity in ML Fashion and exit from the company for mutually agreeable inventory.  They discussed that no more ML Fashion inventory was to be diverted to Noemi, and Menkin agreed to this.  Lemonis never agreed that Menkin could compete with ML Fashion.

57.     Lemonis and Goureau similarly discussed a deal where Goureau would exchange all of his equity in ML Fashion and exit from the company for mutually agreeable inventory. Lemonis never agreed that Goureau could compete with ML Fashion.

58.     During these discussions, Menkin and Goureau made numerous misrepresentations to Plaintiffs, through Lemonis, typically via email, text message or telephone calls.

59.     In particular, Menkin and Goureau represented that they would not take ML Fashion's inventory without Plaintiffs' authorization and approval, or otherwise take actions to compete with, or harm, Plaintiffs.

60.     For example, Menkin texted Lemonis on January 19, 2020 to say that "I wouldn't do it [*i.e.*, take inventory] without [Lemonis'] approval."  (**Ex. 2** pg. 8 of 10).

61.     That was a false statement, however, as Menkin ultimately did take inventory without Lemonis' or Plaintiffs' approval, as set forth further below.

62.     Ultimately, Menkin and Goureau did not follow through with transferring their equity to Lemonis, and never intended to do so.  Instead, they ceased all communications with Lemonis in early 2020.

63.     Then in June 2020, they filed their lawsuits, as set forth below.  Despite Lemonis's good faith attempts to resolve the parties' differences, it has become apparent that all of Menkin's and Goureau's negotiations with Lemonis about exchanging their equity for inventory, however, were a smoke-screen to fraudulently mislead Lemonis into thinking they were resolving their disputes, all the while they were secretly preparing lawsuits so they could appear as the purported victims.

64.     In reliance upon Menkin's and Goureau's misrepresentations to Lemonis, Plaintiffs refrained from bringing suit against Menkin and Goureau during this period, and ML Retail continue to provide funding to ML Fashion.

**E.     Defendants' seizure of ML Fashion inventory for personal purposes.**

65.     Meanwhile, Menkin continued to utilize her position as titular President of ML Fashion to unduly influence ML Fashion employees and misappropriate ML Fashion inventory both during and after these separation discussions.

66.     In fact, as the end of her tenure at ML Fashion became clear, Menkin embarked on a surge of involvement in ML Fashion's inventory in order to exert control over ML Fashion's products for her, Goureau, Nagrani, and Nobelle's personal gain.

67.     To date, Plaintiffs have uncovered four instances where Menkin, on behalf of the competing Nobelle business she formed with Nagrani, took without authorization at least 3,922 items of clothing and other merchandise from ML Fashion, with a wholesale cost of at least $109,443.93, and a retail value of at least $207,473.90.

68.     The foregoing represents only the minimum amount of inventory improperly taken for use by Nobelle, however.  Menkin and Nagrani were both affiliated with ML Fashion at the time they improperly took the inventory.  Based upon Plaintiffs' investigation to date, Plaintiffs believe that Menkin and Nagrani used their positions to take steps to cover their tracks, including by potentially deleting or altering ML Fashion inventory records, and Plaintiffs have only uncovered some of the ways in which Defendants attempted to hide their misconduct.

69.     On January 13, 2020, Lemonis, Menkin (who at that time was still president of ML Fashion), and ML Fashion employee Johnna Griep ("Griep") were contacted by Front Door Fashion ("FDF").

70.     FDF is a company that works with ML Fashion to sell merchandise online on ML Fashion's behalf.

71.     FDF contacted ML Fashion because it wished to return to ML Fashion 1,296 items, including pants, blouses, shirts, skirts, and coats.

72.     The products included items bearing private-label, exclusive brand names owned by ML Fashion, such as a.M, Brkn Heart, and The Line.

73.     The products also included third-party brands sold by ML Fashion, such as Ankle Traveler, Autumn Cashmere, and Brochu Walker.

74.     On January 13, 2020, Menkin responded to tell FDF that she would provide them with a shipping address for the items.

75.     Menkin then apparently emailed FDF separately, without copying Lemonis or Griep, to tell FDF to ship the 1,296 items of clothing to a location on the Upper East Side of Manhattan, New York, 1035 Third Avenue (the "Noemi Store").

76.     Since October 2019, the Noemi Store had been controlled exclusively by Menkin's mother, Noemi Goureau.

77.     Accordingly, at the time Menkin directed FDF to ship ML Fashion's product to the Noemi Store, the store was not an ML Fashion location or otherwise controlled by ML Fashion, and so Menkin had no authority from ML Fashion to ship items there, and had no reason to do so except in order to use the merchandise for her personal purposes.

78.     Plaintiffs only learned that FDF had shipped the goods at all because FDF subsequently sent the Federal Express tracking numbers for the shipments, totaling 46 boxes, to Menkin, Lemonis, and Griep.

79.     According to FDF, they shipped 46 boxes to the Noemi Store, at Menkin's direction, via FedEx Tracking Numbers 779663974880, 779664710077, and 779665961437.

80.     Notably, Menkin attempted to have FDF ship additional product to her on May 7, 2020.

81.     At that time, FDF advised Menkin that it would not ship additional product to her without direct authorization from Lemonis or Griep.

82.     The second incident of which Plaintiffs are aware occurred on January 24, 2020, when Menkin directed 2,769 items to be shipped from an ML Fashion warehouse to the Noemi Store.

83.     Menkin took this action without notifying ML Fashion.

84.     ML Fashion discovered the shipment later when Greip reviewed ML Fashion's inventory records and its Federal Express charges because Meknin used ML Fashion's Federal Express charge account to ship the goods for her personal purposes.

85.     The 2,769 items included shirts, hooded sweatshirts, pants, and sunglasses.

86. The products included products from third-party brands sold by ML Fashion, such as Ankle Traveler, and sunglasses from a company part-owned by Marcus Lemonis, Ellison Eyewear.

87. Based on ML Fashion's Federal Express invoices, the shipments were delivered to the Noemi Store on January 28, 2020 by Federal Express, in a total of 25 boxes with FedEx Tracking Numbers 779902747497, 779902758314, 779902735975, 779902745369, 779902734795, 779902743377, 779902752809, 779902744101, 779902742072, 779902757400, 779902736798, 779902741444, 779902739499, 779902739238, 779902754444, 779902750975, 779902759387, 779902749033, 779902737990, 779902746148, 779902755337, 779902751504, 779902761034, 779902756447, 779902749489.

88. On February 3, 2020, in a third instance of misconduct, Menkin shipped an additional 335 items from ML Fashion's warehouse to the Noemi Store.

89. These items included shirts, sweaters, pants, tote bags, and sunglasses.

90. The products included third-party brands sold by ML Fashion, such as Ankle Traveler, as well as sunglasses from the Lemonis-affiliated Ellison Eyewear.

91. The fourth incident of unauthorized shipment of products occurred on February 6, 2020, when Menkin shipped 40 more items from ML Fashion's warehouse to the Noemi Store.

92. These items included shirts, hooded sweatshirts, and sunglasses, including from Ellison Eyewear.

93. Plaintiffs believe that Nagrani, as Menkin's business partner and a former ML Fashion employee, assisted Menkin in transporting the stolen product from the Noemi Store to Nobelle during the time when Nagrani was serving as ML Fashion's manager for its New York City and Greenwich retail stores.

94.     Among other things, by virtue of her employment with ML Fashion, Nagrani was aware that many of the products Menkin had shipped to the Noemi Store were exclusive, private-label brands sold only by, or with the authorization of, ML Fashion.

95.     Plaintiffs did not authorize Defendants to take or sell this exclusive ML Fashion inventory.

**F.      Menkin and Goureau's lawsuits.**

96.     On or about June 18, 2020, Menkin and Goureau filed simultaneous, duplicative lawsuits against, *inter alia*, Lemonis and ML Retail in Delaware state court (the "Delaware Action") and in the United States District Court for the Southern District of New York (the "New York Action") in an attempt to avoid culpability for their improper use of ML Fashion's funds for their own personal use and in a misguided scheme to attempt to extract even more money from ML Fashion, ML Retail, and Lemonis.

97.     Among other things, the Delaware Action sought to prevent Lemonis and ML Retail from continuing to operate ML Fashion and to dissolve ML Fashion so that Menkin and Goureau can take ML Fashion's assets for themselves.

98.     On March 30, 2021, the court in the Delaware Action held that Menkin and Goureau violated the prohibition against claim splitting by filing duplicative lawsuits in Delaware and New York, and stayed the Delaware Action pending the outcome of the New York Action.

99.     Following the filing of the Delaware Action and the New York Action, Menkin and Goureau engaged in this further scheme and misconduct as described herein.

**G.      Menkin, Goureau, and Nagrani form "Nobelle" to compete with ML Fashion.**

100.    In or about 2020, Menkin, Goureau, and Nagrani formed "Nobelle," a competing clothing store.

101.    In or about August 2020, Nobelle, Menkin, and Nagrani began occupying and operating a retail store at the Greenwich Property in Connecticut under the "Nobelle" brand name (the "Nobelle Store") to sell ML Fashion's stolen inventory, private brands, and products (the "Inventory"), all without Lemonis', ML Fashion's or ML Retail's authorization or consent.

102.    At the time Defendants opened the competing Nobelle Store, ML Fashion was still operating the Meatpacking Store in the same retail market.

103.    Nobelle, Menkin, and Nagrani, are promoting Nobelle's illicit business in interstate commerce through a website and social media pages, including on Facebook and Instagram, which depict Defendants' exclusive possession of the Greenwich Property, sales of the Inventory, and use of the FFE.  Examples of the website and social media pages are attached as **Exhibits 3-6** to this Complaint.  (**Exhibit 3** - Nobelle's Website; **Exhibit 4** - Nobelle's Instagram Account; **Exhibit 5** - Nobelle's Facebook page; **Exhibit 6** - Nobelle's online "Shop").

104.    Menkin and Nagrani admit their affiliation as co-founders of Nobelle on their website and in an Instagram post (**Ex. 3** and **Ex. 4**).

105.    Many of the items from the January 12, January 24, February 3, and February 6, 2020 shipments to the Noemi Store have appeared in the Nobelle Store and in Nagrani's and Menkin's social media posts and pictures promoting Nobelle.

106.    For example, the following image from the Nobelle store shows white-and-black patterned pants and khaki pants from Ankle Traveler, which were part of Menkin's January 13, January 24, and/or February 3, 2020 shipments:



107.    ML Fashion sells those same Ankle Traveler pants on its website as well:



108.    Another image of the Nobelle Store shows dozens of colored shirts and sweaters that came from ML Fashion's exclusive "The Line" brand, and which were part of either the January 13 or January 24, 2020 shipments:



109.    These privately branded ML Fashion products are exclusive to ML Fashion, and no other retailer is authorized to carry, market, or sell these products.

110.    Defendants are also selling at their Nobelle Store, and to customers nationwide online, at least some of the products identified above, as well products from the same third-party brands and, in some cases, the exact same products as those sold by ML Fashion.

111.    For example, the following image from the Nobelle Store shows that Nobelle is selling sweaters from the brands Brochu Walker and Autumn Cashmere; the Brochu Walker sweater is on the left, and the Autumn Cashmere sweater is on the right:



112.    ML Fashion sells the same or similar sweaters from these same brands, as shown in screenshots taken from the website for ML Fashion's "MARCUS" stores, which show just a few examples of the sweaters ML Fashion sells from these brands:



113.    Nobelle, Menkin, and Nagrani are selling ML Fashion's Inventory at the Greenwich Property in interstate commerce without ML Fashion's authorization or consent, and are keeping the proceeds from such sales for themselves, without making any payments to ML Fashion.

114.    In addition to selling ML Fashion's exclusive, private-label brands like "The Line" and the ML Fashion merchandise stolen on January 13, January 24, February 3, and February 6 2020, Nobelle is selling items that are identical to the products sold by ML Fashion and are obtained from the same vendors used by ML Fashion via Nobelle's website, which is available to customers nationwide.

115.    The Nobelle website postings for these items are identical to those on ML Fashion's website, down to the prices and the photographs and text descriptions of the products on the website.

116.    For example, Nobelle is selling to consumers nationwide silver Sei rings, shown in a screenshot taken from the Nobelle website (https://shopnobelle.com/shop/ols/products/sei-ring-silver):



117.    The same exact product is shown in this screenshot from ML Fashion's MARCUS website (https://shopmarcus.com/collections/everyday-jewelry/products/sei-ring-silver):



118.    Nobelle is selling the exact same product at the exact same price using the same photograph and text description to promote the product.

119.    Another example is the gold rainbow edge bangle, shown in this screenshot from the Nobelle website (https://shopnobelle.com/shop/ols/products/rainbow-edge-bangle-gold):



120.    And    here    is    the    same    product    on    ML    Fashion's    website (https://shopmarcus.com/collections/everyday-jewelry/products/rainbow-edge-bangle-gold):



121.    Again, same product, same price, same photograph, and same text description of the product.

122.    The foregoing are just a few examples of Nobelle's competition, rather than an exhaustive list.  A comparison of the two websites reveals many more identical or strikingly similar products, ranging from clothing to handbags and clutch purses to other pieces of jewelry.

123.    As of the date of this Complaint, Nobelle's website for online ordering (https://shopnobelle.com/shop) is active and appears to be accessible to consumers nationwide.

124.    Nobelle's website contains at least one picture taken by ML Fashion employees in connection with ML Fashion's intention to sell those goods, a picture of a stack of jeans shown in the following image taken from Nobelle's website:



125.    Nobelle is sowing confusion in the marketplace, causing consumers and others in the industry to believe that Nobelle is a subsidiary of, other otherwise affiliated with, Plaintiffs or with Lemonis personally.

126.    Nobelle's web address (shopnobelle.com) is quite similar to the website ML Fashion uses to sell goods to consumers nationwide under the MARCUS brand (shopmarcus.com) in that both websites append "shop" in front of the store name (Nobelle and MARCUS, respectively).

127.    Moreover, as recently as February 2021, Menkin was expressly leveraging her association with ML Fashion to promote Nobelle.  As shown in the following screenshot, Menkin's Instagram page referred to her as the "Founder [of] ML Fashion," followed immediately by "also JUST LAUNCHED @shopnobelle":



128.     Although Menkin recently changed her Instagram page to read "Founder of Many things I am proud of," for months Menkin was deliberately using her association with ML Fashion to confuse consumers about whether Nobelle is affiliated with ML Fashion.

129.     Despite removing the reference to her being a founder of ML Fashion after sowing confusion for many months, as of the date of this Complaint, Menkin's Instagram page still includes images indicating an affiliation with Lemonis and/or Plaintiffs, as shown in these screenshots, which include a picture of one of ML Fashion's MARCUS retail stores:



130.     In short, the Nobelle Store and website are like mirror images of ML Fashion's stores and website.  Defendants stole, are selling, and are using promotional photographs of more than $100,000 worth of goods taken without authorization from ML Fashion, including ML

Fashion's exclusive, private label products such as "The Line" brand, to operate their competing business, Nobelle, while also selling other goods identical to those sold by ML Fashion.

131.    Moreover, as set forth above, Defendants are deliberately sowing confusion in the marketplace about their affiliation with, or connection to, Plaintiffs and/or Lemonis.

132.    Defendants efforts to sow confusion have worked.  Since in or about late 2020, ML Fashion has been receiving calls from vendors about unpaid bills or about where to ship certain goods that have turned out to be for Nobelle.

133.    Based upon these discussions, Plaintiffs believe that vendors are extending credit to Nobelle for trade goods based upon the vendors' mistaken assumption that Nobelle's debts are being backed by Lemonis or by Plaintiffs.

134.    If sophisticated vendors active in the fashion industry are confused about whether Nobelle's operations have been authorized by Plaintiffs, then it is very likely that average consumers will be equally or even more confused by Defendants' conduct.

**H.    Defendants improperly use stolen FFE**

135.    Nobelle, Menkin, and Nagrani are also utilizing the FFE owned by ML Fashion at the Property, without ML Fashion's authorization or consent.

136.    The FFE owned by ML Fashion at the Greenwich Property now being utilized by Defendants without authorization includes shelving, permanent brackets (large metal bars coming down from the ceiling into which other fixtures can be fit), and wooden hangers:



137.     In addition to that FFE, ML Fashion believes that Plaintiffs are using FFE taken from other former ML Fashion stores that were closed in 2018 or 2019.

138.     In particular, some of the nesting tables and the t-shaped, metal stand under a chandelier in the Nobelle store appear to be fixtures that were used in other ML Fashion stores:



139.    When ML Fashion closed stores in Greenville, South Carolina, Syosset, New York, and San Francisco, California in 2018 and 2019, Menkin handled the removal of the ML Fashion FFE located in those stores.

140.    Menkin was in a position to control that FFE as president of ML Fashion, and she abused that position in order to re-route this ML Fashion FFE for Nobelle's use at the Greenwich Property.

141.    Both the Inventory and FFE are collateral for the Loan

142.    Without the Inventory and the FFE, and the proceeds from the sale of the Inventory, ML Fashion's full performance under the Credit Agreement and Security Agreement has been compromised, ML Fashion is in jeopardy of defaulting and breaching the agreements, and its performance will be rendered impossible.  Further, the jobs of the existing part-time and full-time employees are jeopardized.

## I.    Defendants' computer fraud and trade secret misappropriation.

143.    Defendants have also improperly seized, and have refused to return to Plaintiffs, two computers owned by ML Fashion and containing sensitive, confidential, and trade secret information of ML Fashion.

144.    The computers were taken by one of the Defendants, presumably Menkin or someone acting at Menkin's direction, from a locked office in New York not open to the public.

145.    In particular, an ML Fashion employee advised Menkin that ML Fashion was closing the office and relocating to a shared workspace operated by WeWork in New York.

146.    Menkin, upon learning that the office was to be closed, and rather than transfer the computers to another ML Fashion location, abused her position as then-president of ML Fashion to access the office while no one was there and take two computers that she knew would have confidential information on them.

147.    One of the computers belonged to ML Fashion's former controller, and the other to ML Fashion's former bookkeeper.

148.    Accordingly, given that the computers were utilized by the individuals overseeing, and compiling information regarding, among other things, ML Fashion's finances and performance, as well as the company's books and records, the computers have significant confidential information on them.

149.    Specifically, the computers have, among other things, information regarding ML Fashion's profitability year-over-year; its bills and invoices, including for the products ML Fashion sells at retail; the rent and utility payments at each of ML Fashion's locations; ML Fashion's banking information, including communications between ML Fashion and Chase Bank; documents relating to ML Fashion's landlords for its other retail stores; inventory information; and product levels in each of ML Fashion's retail stores.

150.    The computers also have software on them that allows users to remotely log into ML Fashion's "point of sale" or POS system and obtain ML Fashion's customer information if the computer user has active login credentials.

151.    Based upon the national character of ML Fashion's retail business, these computers were used to conduct business in interstate commerce.

152.    Defendants improperly accessed and utilized the highly confidential information on these computers.

153.    On August 4, 2020, user "Nicolas" (*i.e.*, Goureau) logged into the computer used by ML Fashion's former bookkeeper:



154.    On August 6, 2020, this same "Nicolas" user logged into the computer again, and attempted to install the Nobelle Realtime POS program on that computer:





155.    At that point, Goureau severed Plaintiffs' ability to access the computers

remotely, impairing their ability to access data on the computers and also preventing them from

seeing what Defendants were doing with the computers.

156.    The second computer, which belonged to ML Fashion's former controller, Manish

Karna, was similarly taken by Defendants and used for Nobelle business:





157.    Based upon Plaintiffs' investigation, someone from Nobelle (from what Plaintiffs learned so far, likely Menkin, Goureau, or Nagrani) accessed this computer for Nobelle business, as depicted in the screenshots above, on or about August 31, 2020.

158.    The computers that Defendants have stolen from ML Fashion contain ML Fashion's confidential, proprietary, and trade-secret information, which Defendants have misappropriated.

159.    As set forth above, the computers contain sensitive, confidential information regarding profits, expenses, banking information, inventory, and store product levels, all of which is information that would give other retailers a competitive advantage against ML Fashion (collectively, "ML Fashion's confidential, proprietary, and trade-secret information").

160.    ML Fashion's confidential, proprietary, and trade-secret information is the subject of efforts that are reasonable under the circumstances to maintain the secrecy of such information. The confidential, proprietary, and trade-secret information is generally not distributed to any other party external to ML Fashion.

161.    Further, ML Fashion does not release this information to the general public, nor could others properly acquire or duplicate it without ML Fashion's permission.  No one else can generate this information without knowledge of ML Fashion's confidential operations.  The information is specific to ML Fashion, which makes it nearly impossible to duplicate without detailed information from ML Fashion.

162.    ML Fashion took, and continues to take, extensive measures to safeguard its highly valuable confidential, proprietary, and trade-secret information, such as requiring employees, temporary workers, and contractors to sign confidentiality agreements, requiring employees to execute acknowledgments promising to limit access to confidential information on a "need to know" basis and otherwise maintain the confidentiality of ML Fashion information, and requiring passwords and other security measures for access. ML Fashion controls dissemination of such information even within the confines of the company.

163.     ML Fashion's security measures are consistent with trade secret protections undertaken by other, similar businesses operating in the fashion-related retail industry.

164.     Defendants abused their connection to ML Fashion to circumvent these security measures and steal these trade secrets in order to boost their competitive enterprise, Nobelle.

165.     ML Fashion has devoted significant resources over many years to develop and compile its confidential, proprietary, and trade-secret information.  The development of ML Fashion's confidential, proprietary, and trade-secret information represents the combined efforts of senior-level employees in a variety of departments.

166.     ML Fashion derives independent economic value from its confidential, proprietary, and trade-secret information not being generally known to, and not being readily ascertainable by proper means by other persons who can obtain economic value from its disclosure or use. Maintaining this information's secrecy gives ML Fashion a distinct economic and competitive advantage in the marketplace.

167.     Disclosure of ML Fashion's confidential, proprietary, and trade-secret information would be extremely valuable to ML Fashion's competitors.  Disclosure of ML Fashion's confidential, proprietary, and trade-secret information would also be extremely harmful to ML Fashion and undermine ML Fashion's position in the marketplace.

168.     For example, disclosure would allow ML Fashion's competitors, such as Nobelle, to obtain an unlawful head start and business advantage to more effectively compete against ML Fashion.  Specifically, disclosure would allow competitors such as Nobelle to have an unfair inside look at the inner workings of ML Fashion and how it competes.

169.     Competitors such as Nobelle would then be able to duplicate or attempt to improve on ML Fashion's products, technologies, and services, as well as their internal business strategies

and methodologies, all without the significant costs that ML Fashion spent to develop them.  This includes using ML Fashion's negative information to avoid costly pitfalls and move right to key innovative solutions that took ML Fashion significant time and resources to achieve.

170.    The value of ML Fashion's confidential, proprietary, and trade-secret information is considerable, and its disclosure would cause ML Fashion substantial competitive injury beyond any monetary amount.  Ultimately, disclosure of ML Fashion's confidential, proprietary, and trade-secret information would cause irreparable harm to ML Fashion.

171.    ML Fashion's confidential, proprietary, and trade secret information as described above was on the computers which Defendants' stole and remain in Defendants' possession.

172.    Defendants' access and use of these computers, and ML Fashion's confidential, proprietary, and trade secret information contained within, is unauthorized.   Any authority Defendants had to access these computers was exceeded when Defendants used them to operate a competing business.

173.    Plaintiffs spent over $5,000 in employee time investigating the theft and misuse of these computers before Defendants severed their access to the computers and the information thereon.

174.    Plaintiffs also believe that Defendants' installation of software on the computers has damaged or erased existing data on the computers, though Plaintiffs will not know the full extent of the damage until the computers are returned.

175.    The value of the information on these computers exceeds $5,000 as will the costs at forensic review and remediation when these computers are ultimately returned.  Defendants' use of Plaintiffs' confidential, proprietary, and trade-secret information is further causing Plaintiffs irreparable harm.

176.     Plaintiffs anticipate further losses in connection with restoring the data and information on the computers.

177.     Moreover, Menkin and Goureau are breaching their obligations to both ML Fashion and ML Retail under the LLC Agreement by utilizing the computers and the information thereon to operate a business, Nobelle, that is in direct competition with ML Fashion.

**J.     Plaintiffs' attempts at remediation and Defendants' blatant refusal to return Plaintiffs' property.**

178.     Prior to filing this Complaint, ML Fashion demanded that Defendants return the improperly seized Inventory and FFE.  ML Fashion additionally demanded return of its computers containing ML Fashion's confidential information.

179.     In response, Defendants admitted to both *possession* and *use* of at least one of ML Fashion's computers containing its confidential information.  (*See* September 1, 2020, letter from Defendants, attached hereto as **Exhibit 2**.)  Defendants even specifically touted their willingness to return the computer as the basis why no irreparable harm exists.

180.     In light of Defendants' admissions, Plaintiffs once again demanded return of ML Fashion's computer Defendants' admitted to having in their possession.

181.     On October 2, 2020, Defendants reversed course, reneged on their offer to return one of the stolen computers, and instead refused to turn over the computer they admitted to having. (*See* October 2, 2020, letter from Defendants, attached here as **Exhibit 7**.)  Importantly, neither this letter nor Defendants' original letter provide any assurances they would cease their unlawful and admitted use of the computer, nor admit to their full possession of multiple ML Fashion computers.

182.     Plaintiffs have been and continue to be damaged by Defendants' ongoing misconduct, including due to the fact that Defendants' unauthorized sale of ML Fashion Inventory

at a store formerly operated by ML Fashion is confusing consumers and damaging ML Fashion's reputation and goodwill, is preventing ML Fashion from being able to perform under the Credit and Security Agreements, and is jeopardizing the continued employment of ML Fashion's employees.

**K.      Defendants Raise Baseless Arguments in Response to Plaintiffs' Claims**

183.    In light of Defendants' ongoing misconduct, and refusal to cease that misconduct, on August 31, 2020, Plaintiffs filed suit against Defendants in the United States District Court for the Northern District of Illinois (the "Illinois Action").

184.    Sworn declarations from Marcus Lemonis, Johnna Griep, and Giovanni Senafe filed in the Illinois Action detailing Defendants' misconduct are attached here as **Exhibits 8, 9, and 10**.

185.    In response, Defendants raised, among other things, baseless jurisdictional arguments in an attempt to avoid liability for their misconduct.

186.    Incredibly, in light of their own violation of the rule against claim splitting, Defendants also argued that Plaintiffs violated the rule against claim splitting by filing a separate, unrelated action against Defendants in an Illinois state court in Cook County regarding Defendants' misappropriation and misuse of corporate funds and a corporate American Express credit card (the "Cook County Action").

187.    Defendants' arguments in the Illinois Action were all the more incredible because they admitted in court filings to operating a competing business and to having, selling, and/or utilizing the Inventory, FFE, and computers.

188.    In a filing on September 11, 2020, Defendants admitted that "Menkin and Nagrani launched their business, Nobelle, on or around August 17, 2020, and made their first public post regarding the store on August 23, 2020."

189.   In that same filing, Defendants admitted that what they called a "limited fraction of inventory" was "derived from ML Fashion," arguing, contrary to the facts, that Defendants obtained this inventory with Plaintiffs' consent.

190.   In that same filing, Defendants further admitted that they are selling "MARCUS private label brands" because some of the stolen inventory "included t-shirts branded 'The Line.'"

191.   In that same filing, Defendants further admitted that "the FFE used by Defendants" had been ML Fashion's, and argued that the FFE was "abandoned by ML Fashion," contrary to the facts set forth above and ignoring Goureau's role in preventing ML Fashion from recovering the FFE.

192.   In that same filing, Defendants also represented to the court in the Illinois Action that they had "agreed to return . . . the computer" before, as set forth above, later reversing course and refusing to return that stolen computer.

193.   In a filing in the Illinois Action dated October 26, 2020, Defendants admitted that they were selling the same brands as ML Fashion from "third-party designers such as Autumn Cashmere or others."

194.   In that same filing, Defendants admitted that Menkin took "inventories . . . from stores located in Vermont and Texas."

195.   In a filing in the Illinois Action dated January 4, 2021, Defendants again admitted that they are selling items from the "third-party designers such as Autumn Cashmere or others" whose products are also sold by ML Fashion.

196.   In a sworn declaration also dated January 4, 2021 in the Illinois Action, Menkin admitted that she had "inventory shipped to my new store" in New York from "the ML Fashion warehouse located in Vermont" and from "Front Door Fashion."

197.    In that same sworn declaration, Menkin admitted that "I am also the co-founder of Defendant Nobelle GW LLC."

198.    In a sworn declaration also dated January 4, 2021 in the Illinois Action, Nagrani admitted that "I am the Co-Founder and current President of Defendant Nobelle GW LLC," that she "was an employee of ML Fashion LLC," and that "Nobelle's principal place of business has been, and continues to be, Greenwich, Connecticut."

199.    In a filing in the Illinois Action dated February 3, 2021, Defendants again admitted that they held ML Fashion Inventory, relying upon the false claim that "Lemonis gave Menkin this inventory."

200.    In that same filing, Defendants admitted that were using ML Fashion's FFE, arguing that the "FFE is now part of the [Nobelle] leasehold" for the Greenwich Property.

201.    In that same filing, Defendants claimed that they were refusing to "return the items without going through the proper discovery and litigation protocols."

202.    In that same filing, Defendants admitted that "Nobelle sold $6,812.32" worth of this Inventory, for which "Menkin [personally] received $3,397.91."

203.    In that same filing, Defendants also admitted that they took two computers "to run their point-of-sale system" for Nobelle.

204.    In a declaration accompanying this filing, Menkin admitted that Nobelle took at least 25 sweaters, 10 tees/tanks, 1 button down shirt, and 15 dresses owned by ML Fashion.

205.    In that same declaration, Menkin admitted that she "installed Nobelle's point-of-sale system" on one of the stolen computers and removed another from "ML Fashion's New York office."

206. Despite Defendants' repeated admissions, rather than burden the court in Illinois with Defendants' baseless arguments regarding jurisdiction and claim splitting, on March 26, 2021, Plaintiffs agreed to voluntarily dismiss the Illinois Action, without prejudice.

207. Plaintiffs are re-filing their claims in this Court, where Defendants cannot in good faith claim that they are not subject to the Court's personal jurisdiction given their operation of an improper retail store in this State, and have eliminated any arguable overlap with the Cook County Action.

208. Lemonis, as the manager of each of the Plaintiffs, has authorized them to bring this suit.

**FIRST CAUSE OF ACTION**
**(Conversion by ML Fashion Against All Defendants)**

209. Plaintiffs hereby repeat and reallege each and every allegation contained in paragraphs 1 through 208 of this Complaint as if fully set forth herein.

210. ML Fashion owns the Inventory being held and/or offered for sale by Nobelle at the Greenwich Property. ML Fashion also owns the computers Nobelle is currently using, which contain ML Fashion confidential financial information, and much of the FFE utilized at the Nobelle Store.

211. Nagrani, Goureau, and Menkin, on behalf of Nobelle, at the direction of Menkin, and utilizing the computer system set up by Goureau on ML Fashion's stolen computers (containing confidential ML Fashion financial information), have stolen ML Fashion's Inventory and FFE, and have prevented ML Fashion from utilizing or possessing that Inventory and FFE.

212. Goureau also interfered with Plaintiffs' ability to recover the FFE by intimidating the ML Fashion employee tasked with retrieving the FFE, to ensure that Defendants could convert the FFE for their own personal purposes.

213.   ML Fashion has demanded the return of the computers, Inventory and FFE from Defendants.

214.   ML Fashion has suffered damages as a result of Defendants' misconduct, including but not limited to loss of exclusive possession of its property, lost profits from the sale of the Inventory, and the value of the stolen computers, Inventory and FFE.  In addition, by unlawfully seizing the collateral of the Loan, Defendants' actions risk default on the Loan, further causing ML Fashion harm

215.   By reason of the foregoing, ML Fashion is entitled to injunctive relief for the return of the Inventory and FFE as well as damages in an amount to be determined at trial and an order requiring Defendants to return the unsold, converted Inventory and FFE to ML Fashion.

**SECOND CAUSE OF ACTION**
**(Breach of Fiduciary Duty by ML Fashion Against Menkin and Goureau)**

216.   Plaintiffs hereby repeat and reallege each and every allegation contained in paragraphs 1 through 215 of this Complaint as if fully set forth herein.

217.   Menkin is a member and officer of ML Fashion.

218.   Goureau is a member of ML Fashion.

219.   As members and/or officers of ML Fashion, Menkin and Goureau owed fiduciary duties to ML Fashion, including because they were not passive members of ML Fashion but instead took an active role in the management of ML Fashion.

220.   Menkin and Goureau have breached their fiduciary duties to ML Fashion by, among other things: (a) abusing their positions with ML Fashion to seize computers, Inventory and FFE owned by ML Fashion for Menkin's and Goureau's personal benefit, without ML Fashion's authorization or consent; (b) using ML Fashion's Inventory and FFE to generate profits for Menkin, Goureau, and Nobelle; (c) occupying the Greenwich Property formerly operated by ML

Fashion and excluding ML Fashion from that property; and (d) operating a business, Nobelle, that is competing with ML Fashion.

221.    ML Fashion has been irreparably harmed and damaged by Menkin's and Goureau's breaches of their fiduciary duties, including jeopardizing the existence of the business, jobs and reputation, which money cannot make whole, as well as lost profits, the lost value of the Inventory and FFE improperly seized, and loss of use of the Greenwich Property.

222.    By reason of the foregoing, ML Fashion is entitled to injunctive relief and damages in an amount to be determined at trial.

### THIRD CAUSE OF ACTION
**(Breach of Contract by Plaintiffs Against Menkin and Goureau)**

223.    Plaintiffs hereby repeat and reallege each and every allegation contained in paragraphs 1 through 222 of this Complaint as if fully set forth herein.

224.    ML Retail, Menkin, and Goureau are parties to the LLC Agreement.

225.    The LLC Agreement is a valid contract.

226.    Menkin and Goureau owe obligations to both ML Retail and ML Fashion under the terms of the LLC Agreement.

227.    ML Retail and ML Fashion have each fully performed their obligations under the LLC Agreement.

228.    Menkin and Goureau have breached the LLC Agreement by, *inter alia*, operating a fashion retail business, Nobelle, that is in direct competition with ML Fashion's business, in violation of Section 7.7 of the LLC Agreement.

229.    In particular, Menkin's and Goureau's conduct is preventing ML Fashion from opening another store in the same retail market, and constitutes competition with ML Fashion stores and ML Fashion's website via, *inter alia*, the Nobelle website that sells competing goods to

consumers nationwide, all while creating consumer confusion about whether Nobelle is affiliated with, or authorized by, Plaintiffs.

230.    Defendants are selling the same products and brands as ML Fashion, including private-label, exclusive brands owned by ML Fashion and sold only by ML Fashion and its authorized retailers, at a former ML Fashion retail store that Defendant Nagrani had managed on ML Fashion's behalf, or on a website whose web address mirrors ML Fashion's web address and frequently uses the same photographs and product description text as ML Fashion's website, all while Menkin has leveraged and continues to leverage ML Fashion's and Lemonis' names on social media to promote the competing business.

231.    Section 7.7 of the LLC Agreement prevents any competition by Menkin and Goureau with ML Fashion, which is a reasonable restriction because they are members of the LLC, rather than employees, and because ML Fashion operates its retail business nationwide.

232.    ML Fashion has been damaged by Menkin's and Goureau's breaches of the LLC Agreement, including in the form of lost profits due to Nobelle's competition with ML Fashion.

233.    ML Retail has been damaged by Menkin's and Goureau's breaches of the LLC Agreement, including because of the impact of Menkin's and Goureau's improper competition on the value of ML Retail's membership interests in ML Fashion.

234.    In addition, Menkin and Goureau's unlawful competition diminishes the collateral on the loan between ML Fashion and ML Retail.  This further harms ML Fashion by risking default on the loan, and it harms ML Retail by reducing the value of the Loan and the likelihood of full repayment.  Moreover, the jobs of the employees of ML Fashion are jeopardized if ML Fashion ceases to operate.

235.    In Section 7.7(d) of the LLC Agreement, Menkin and Goureau expressly agreed that Plaintiffs could seek specific performance of Menkin's and Goureau's obligations under Section 7.7.

236.    By reason of the foregoing, Plaintiffs are being irreparably harmed and the existing jobs and membership interests in the business are jeopardized.  Plaintiffs are also entitled to damages in an amount to be determined at trial and an order requiring Menkin and Goureau to specifically perform their obligations under Section 7.7 of the LLC Agreement by, among other things, ceasing their operation of Nobelle and any other business in competition with ML Fashion's business.

### FOURTH CAUSE OF ACTION
### (Fraud by Plaintiffs Against Menkin and Goureau)

237.    Plaintiffs hereby repeat and reallege each and every allegation contained in paragraphs 1 through 236 of this Complaint as if fully set forth herein.

238.    Menkin and Goureau made false statements of material fact they knew were false or made with culpable ignorance of their truth or falsity, and specifically that they would not personally take possession, custody, and control of ML Fashion FFE and Inventory without authorization; that Menkin and Goureau would only use their positions of trust within ML Fashion to advance the company's interests; that Nobelle's products were exclusively their own and for sale; and other representations and misrepresentations as set forth above.

239.    Among other things, as set forth above, in email, text message, and telephone conversations with Lemonis in 2020, Menkin and Goureau represented that they would not seize ML Fashion Inventory and FFE for their own personal use, would not operate a competing enterprise, and would not otherwise harm Plaintiffs.

240.    Plaintiffs relied upon Menkin's and Goureau's false statements to their detriment.

241.    Among other things, in reliance on Menkin's and Goureau's representations, ML Retail continued to provide funding to ML Fashion for operations, and Plaintiffs refrained from bringing suit against Defendants based upon Menkin's and Goureau's misconduct.

242.    Menkin and Goureau never intended to fulfill their obligations.  Even as Plaintiffs relied upon Menkin's and Goureau's false statements that they would only use ML Fashion FFE and Inventory for ML Fashion business, Menkin and Goureau went behind Plaintiffs' backs, removed the ML Fashion FFE and Inventory, and are now falsely advertising to the public that ML Fashion's FFE and Inventory are their own and further retaining the proceeds of the sales.

243.    As a result of Menkin's and Goureau's fraud, Plaintiffs have suffered damages in an amount to be determined at trial, including in the form of lost Inventory and FFE and damage to Plaintiffs' goodwill and reputation.

### FIFTH CAUSE OF ACTION
**(Tortious Interference with Noncompetition Agreement Against All Defendants)**

244.    Plaintiffs hereby repeat and reallege each and every allegation contained in paragraphs 1 through 243 of this Complaint as if fully set forth herein.

245.    The LLC Agreement is a valid, enforceable, and binding contract between Plaintiffs and Defendants Menkin and Goureau.

246.    Menkin and Goureau had knowledge of the LLC Agreement and its non-competition provisions as signatories to the LLC Agreement and owners of ML Fashion.

247.    Nobelle had knowledge of the LLC Agreement and its non-competition provisions by virtue of the fact that it is controlled by Menkin, who signed and is a party to the LLC Agreement.

248.    Upon information and belief, Nagrani had knowledge of the LLC Agreement and its non-competition provisions by virtue of her past employment with ML Fashion and her interactions with Menkin.

249.    Menkin and Goureau intentionally sought information and elicited actions from one another in ways that they knew would cause the other to violate the terms of the LLC Agreement, all while acting outside the scope of their authority under the LLC Agreement.

250.    Nobelle and Nagrani elicited actions from Menkin and Goureau that they knew would cause Menkin and Goureau to violate the terms of the LLC Agreement.

251.    As a result of Defendants' intentional interference with Menkin and Goureau's contractual relationships with ML Fashion, Plaintiffs have suffered damages in an amount to be determined at trial.

## SIXTH CAUSE OF ACTION
### (Aiding and Abetting Against Menkin, Goureau, and Nagrani)

252.    Plaintiffs hereby repeat and reallege each and every allegation contained in paragraphs 1 through 251 of this Complaint as if fully set forth herein.

253.    By competing with ML Fashion using its own store, products, and Inventory, Nobelle performed a wrongful act which caused Plaintiffs injury.

254.    Menkin, Goureau, and Nagrani were aware of their roles as part of the overall or tortious activity at the time they provided the assistance.

255.    Menkin, Goureau, and Nagrani knowingly and substantially assisted the principal violation and benefitted from the wrongful conduct by, among other things, profiting from Nobelle's competition with ML Fashion.

256.    Further, by breaching the noncompetition provision of the LLC Agreement, Menkin and Goureau performed wrongful acts that caused Plaintiffs injury.

257.    Nagrani was aware of her role as part of the overall tortious activity at the time she provided the assistance.

258.    Nagrani knowingly and substantially assisted the principal violation of the LLC Agreement by Menkin and Goureau and benefitted from the wrongful conduct by, among other things, profiting from Nobelle's competition with ML Fashion.

259.    As a result of Menkin, Goureau, and Nagrani's aiding and abetting with Nobelle's, Menkin's, and/or Goureau's wrongful and injurious acts, Plaintiffs have suffered damages in an amount to be determined at trial.

**SEVENTH CAUSE OF ACTION**
**(False Advertising under Lanham Act Against All Defendants)**

260.    Plaintiffs hereby repeat and reallege each and every allegation contained in paragraphs 1 through 259 of this Complaint as if fully set forth herein.

261.    The acts and omissions of Defendants described above constitute false advertising in violation of 15 U.S.C. § 1125(a) and Illinois common and statutory law.

262.    In their commercial advertising and promotion, Defendants have used in interstate commerce words, false designations of origin, and/or false or misleading descriptions and representations of fact, which are likely to cause confusion, or to cause mistake, or to confuse or deceive as to the nature, characteristics, qualities, or geographic origin of Plaintiffs' goods, services, and commercial activities.

263.    In particular, Defendants have falsely represented, in interstate commerce via the Internet and social media advertising, that they are selling goods belonging to Nobelle when, in fact, Defendants are selling ML Fashion's Inventory without ML Fashion's authorization, including exclusive, private-label product from brands owned by ML Fashion and sold only by ML Fashion and its authorized retailers.

264.    Because Nobelle's statements to consumers that the Inventory belongs to Nobelle are literally false, they are necessarily deceiving consumers.

265.    Moreover, Defendants are selling goods (including ML Fashion's private-label, exclusive brands and products identical to those sold by ML Fashion) and promoting their business in a manner that is likely to, and actually has, caused confusion, about whether Nobelle is affiliated with or otherwise authorized by ML Fashion—a result Defendants clearly intended.

266.    Plaintiffs have been damaged as a proximate result of the acts and omissions of false advertising committed by Defendants, including through lost sales, the loss of the Inventory, and damage to Plaintiffs' reputation and goodwill.

267.    Defendants conduct has been willful and in bad faith, making this an exceptional case under 15 U.S.C. § 1117.

268.    Defendants' conduct has caused and is causing irreparable injury to Plaintiffs, including damage to Plaintiffs' reputation and goodwill and ML Fashion's ability to continue to employ its  employees, and unless enjoined by this Court, will continue to damage and irreparably harm Plaintiffs and to deceive the public in a manner that is not compensable by money damages. Plaintiffs have no adequate remedy at law with respect to Defendants acts of false advertising.

## EIGHTH CAUSE OF ACTION
### (Unfair Competition under Lanham Act Against All Defendants)

269.    Plaintiffs hereby repeat and reallege each and every allegation contained in paragraphs 1 through 268 of this Complaint as if fully set forth herein.

270.    The acts and omissions of Defendants described above constitute unfair competition in violation of 15 U.S.C. § 1125(a) and Illinois common and statutory law.

271.    Defendants have used in interstate commerce words, false designations of origin, and/or false or misleading descriptions and representations of fact, which are likely to cause

confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of Defendants to the origin, sponsorship, or approval of the Inventory the subject of this lawsuit, the fruits thereof, and the commercial activities associated therewith.

272.    Defendants are passing off Plaintiffs' exclusive, private-brand goods, such as products bearing ML Fashion's exclusive "The Line" brand, and other goods owned by ML Fashion to consumers as being Defendants' own goods, giving rise to consumer confusion as a matter of law.

273.    Defendants have also made efforts to sow confusion about whether Nobelle is affiliated with, or authorized by Plaintiffs, which has resulted in actual confusion among vendors.

274.    In particular, Defendants' promotional materials for Nobelle and its products are generating confusion about whether Nobelle is affiliated with, or authorized by, ML Fashion, including through Menkin's Instagram page, and through websites with similar web addresses selling identical and similar products.

275.    Plaintiffs have been damaged as a proximate result of the acts and omissions of unfair competition committed by Defendants, including through lost sales, the loss of the Inventory, and damage to Plaintiffs' reputation and goodwill.

276.    Defendants conduct has been willful and in bad faith, making this an exceptional case under 15 U.S.C. § 1117.

277.    Defendants' conduct has caused and is causing irreparable injury to Plaintiffs, including damage to Plaintiffs' reputation and goodwill and ML Fashion's ability to continue to employ its employees, and unless enjoined by this Court, will continue to damages Plaintiffs and to deceive the public in a manner that is not compensable by money damages.  Plaintiffs have no adequate remedy at law with respect to Defendants acts of false advertising.

## NINTH CAUSE OF ACTION
### (Violation of the Computer Fraud and Abuse Act ("CFAA") 18 U.S.C. §§ 1034, et seq.
### Against All Defendants)

278.    Plaintiffs hereby repeat and reallege each and every allegation contained in paragraphs 1 through 277 of this Complaint as if fully set forth herein.

279.    As set forth above, Defendants have violated the CFAA by intentionally accessing Plaintiffs' computers used for interstate commerce or communication, without authorization, and/or by exceeding authorized access to such computers and by obtaining information from such a protected computer, and so causing significant damage.

280.    Defendants knowingly, and with intent to defraud Plaintiffs through their wrongful actions, by accessing Plaintiffs' protected computers without authorization or by exceeding authorized access to such computers, and by means of such conduct, furthering their intended fraud and obtaining one or more things of value, including but not limited to significant confidential, proprietary, and trade secret information relating to Plaintiffs' business.   Such confidential, proprietary, and trade secret information was exclusively Plaintiffs' property.

281.    Defendants have violated the CFAA by intentionally accessing Plaintiffs' protected computers, without authorization and/or beyond the scope of authorization granted, causing damage to Plaintiffs, recklessly or without regard for their actions.

282.    Through Defendants' unauthorized access on Plaintiffs' protected computers and systems, Defendants knowingly, and with intent to defraud, transmitted information and/or programs, misappropriated and caused harm to Plaintiffs' trade secrets and confidential information,  and impaired the integrity and availability of data, metadata, programs, systems, and other information.

283.    Plaintiffs have lost access to the computers and the information thereon as a result of Defendants' severing Plaintiffs access, and also believe that Defendants' installation of software on the computers damaged or erased files on the computers.

284.    Defendants' actions as set forth above are direct violations of the CFAA—at minimum, 18 U.S.C §§ 1030(a)(2), 1030(a)(4), and 1030(a)(5)—for which Plaintiffs are entitled to injunctive relief.  *See* 18 U.S.C § 1030(g).

285.    As a direct and proximate result of Defendants' unauthorized access to Plaintiffs' protected computers, Plaintiffs have suffered damages in excess of $5,000.00, including but not limited to costs associated with investigation of the nature and extent of Defendants' unlawful actions, including employee time spent uncovering and investigating Defendants' unauthorized access; the loss, dilution, and unlawful use of Plaintiffs' confidential, proprietary, and trade secret information on the computers in competition to ML Fashion; the anticipated forensic damage assessment of the computers, hiring consultants, and/or employee time spent investigating Defendants' unauthorized access; lost revenues and/or other consequential damages resulting from Defendants' interruption of service; and/or anticipated remediation of Defendants' unlawful actions, including restoring the data, systems, and information prior to the offense and/or implementing security enhancements and remedial measures to Plaintiffs' computer systems.

286.    As a direct and proximate result of Defendants' unauthorized access to Plaintiffs' protected computers, Defendants have further been unjustly enriched.

287.    As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs have also suffered and will continue to suffer incalculable financial losses, imminent and permanent irreparable harm, loss of the confidentiality of their trade secrets, and other continuing harm.  The losses and harm to Plaintiffs are ongoing and cannot be remedied by damages alone.

## TENTH CAUSE OF ACTION
**(Defend Trade Secrets Act 18 U.S.C. §§ 1832, 1836, *et seq*.—Misappropriation of Trade Secrets Against All Defendants)**

288.    Plaintiffs hereby repeat and reallege each and every allegation contained in paragraphs 1 through 287 of this Complaint as if fully set forth herein.

289.    As set forth more fully above, Plaintiffs possess confidential, proprietary, and trade secret information necessary for Plaintiffs' to conduct their business in a competitive market place.

290.    In particular, the information includes information regarding ML Fashion's profitability year-over-year; its bills and invoices, including for the products ML Fashion sells at retail; the rent and utility payments at each of ML Fashion's locations; ML Fashion's banking information, including communications between ML Fashion and Chase Bank; documents relating to ML Fashion's landlords for its other retail stores; inventory information; and product levels in each of ML Fashion's retail stores.

291.    The computers also provide users with the ability to access ML Fashion's customer information through its "point of sale" system if they have login credentials.

292.    Plaintiffs' trade secrets relate to products and services used in, or intended for use in, interstate commerce.

293.    Plaintiffs' trade secrets are of great value Plaintiffs, as set forth above.  They are also valuable to Defendants, who are competitors of Plaintiffs, as is clearly demonstrated by the extent to which Defendants engaged in the gathering, misappropriation, and transfer of such information to Defendants, including without limitation Defendants' refusal to return computers containing such confidential, proprietary, and trade secret information.

294.    Plaintiffs' kept their trade secrets from disclosure through all reasonable, appropriate, and necessary means, consistent with industry practice, such that they were not generally known or available to individuals or entities outside of Plaintiffs.

295.    Among other things, the trade secrets were protected through confidentiality agreements, passwords, and other security measures, all consistent with measures taken by similar businesses in the fashion industry.

296.    Defendants circumvented these protections by accessing a locked office controlled by ML Fashion, apparently with the purpose of specifically targeting these computers because of their highly valuable information.

297.    Plaintiffs' trade secrets revealed to Defendants are critical to the success of Plaintiffs' business and provide Plaintiffs with a distinct competitive advantage in the market place.

298.    Defendants were aware that Plaintiffs' trade secrets were to be kept confidential and not to be disclosed to competitors, customers, and others.

299.    Defendants knew that the confidential, proprietary, and trade secret information being obtained from Plaintiffs' computers and other sources was confidential and in the nature of trade secrets and, nevertheless, Defendants chose to gather, receive, and utilize it.

300.    As further set forth above, Defendants misappropriated Plaintiffs' trade secrets by acquiring them through unlawful means, and with intent to convert them, and/or disclosing and using them on behalf of Plaintiffs' competitors and in derogation of Plaintiffs'' interest, and continuing to retain possession of them to this day, all in violation of the Defend Trade Secrets Act, 18 U.S.C §§ 1832, 1836, *et seq*.

301.   Plaintiffs' trade secrets have been transferred to and maintained on Defendants' computers and other electronic devices.

302.   Plaintiffs' trade secrets remain in the possession of Defendants.

303.   Defendants have not merely retained Plaintiffs' trade secrets, but have actively utilized this information to operate their competing Nobelle business.

304.   Defendants have refused to provide at least one computer known to be taken from Plaintiffs and utilized by Defendants and, therefore, Plaintiffs cannot uncover the full extent of Defendants' theft and misappropriation of Plaintiffs' trade secrets without a forensic examination of Defendants' computers and other electronic devices.

305.   Because Defendants continue to use Plaintiffs' confidential, proprietary, and trade secret information, along with electronic records and documents, Defendants' misappropriation of Plaintiffs' trade secrets is continuing and ongoing.

306.   As a direct and proximate cause of Defendants' wrongful conduct, Plaintiffs have suffered and will continue to suffer incalculable financial losses, imminent and permanent irreparable harm, loss of the confidentiality of their trade secrets, loss of goodwill, loss of business opportunities, and other continuing harm.

307.   The losses and harm to Plaintiffs are ongoing and cannot be remedied by damages alone.

308.   Plaintiffs have no adequate remedy at law for sufficient compensation for the wrongs committed by Defendants.

309.   Defendants have acted willfully, maliciously, and with reckless disregard to the rights of Plaintiffs.

## ELEVENTH CAUSE OF ACTION
### (Defend Trade Secrets Act 18 U.S.C. §§ 1832, 1836, *et seq.*—Threatened Misappropriation of Trade Secrets Against All Defendants)

310.    Plaintiffs hereby repeat and reallege each and every allegation contained in paragraphs 1 through 309 of this Complaint as if fully set forth herein.

311.    As set forth more fully above, Plaintiffs' possess confidential, proprietary, and trade secret information necessary for Plaintiffs' to conduct their business in a competitive market place.

312.    In particular, the information includes information regarding ML Fashion's profitability year-over-year; its bills and invoices, including for the products ML Fashion sells at retail; the rent and utility payments at each of ML Fashion's locations; ML Fashion's banking information, including communications between ML Fashion and Chase Bank; documents relating to ML Fashion's landlords for its other retail stores; inventory information; and product levels in each of ML Fashion's retail stores.

313.    The computers also provide users with the ability to access ML Fashion's customer information through its "point of sale" system if they have login credentials.

314.    Plaintiffs' trade secrets relate to products and services used in, or intended for use in, interstate commerce.

315.    Plaintiffs' trade secrets are of great value Plaintiffs, as set forth above.  They are also valuable to Defendants, who are competitors of Plaintiffs, as is clearly demonstrated by the extent to which Defendants engaged in the gathering, misappropriation, and transfer of such information to Defendants, including without limitation Defendants' refusal to return computers containing such confidential, proprietary, and trade secret information.

316.    Plaintiffs' kept their trade secrets from disclosure through all reasonable, appropriate, and necessary means, consistent with industry practice, such that they were not generally known or available to individuals or entities outside of Plaintiffs.

317.    Among other things, the trade secrets were protected through confidentiality agreements, passwords, and other security measures, all consistent with measures taken by similar businesses in the fashion industry.

318.    Defendants circumvented these protections by accessing a locked office controlled by ML Fashion, apparently with the purpose of specifically targeting these computers because of their highly valuable information.

319.    Plaintiffs' trade secrets revealed to Defendants are critical to the success of Plaintiffs' business and provide Plaintiffs with a distinct competitive advantage in the market place.

320.    Defendants were aware that Plaintiffs' trade secrets were to be kept confidential and not to be disclosed to competitors, customers, and others.

321.    Defendants knew that the confidential, proprietary, and trade secret information being obtained from Plaintiffs' computers and other sources was confidential and in the nature of trade secrets and, nevertheless, Defendants chose to gather, receive, and utilize it.

322.    As further set forth above, Defendants have threatened to misappropriate Plaintiffs' trade secrets through unlawful means, including but not limited to partnering and hiring former employees of Plaintiffs with knowledge of Plaintiffs' trade secrets and by refusal to return Plaintiffs computers containing Plaintiffs' confidential, proprietary, and trade secret information.

323.    Upon information and belief, Defendants intend to further misappropriate and unlawfully use Plaintiffs' confidential trade secret information from Plaintiffs' former employees

and Plaintiffs' computers containing Plaintiffs' confidential, proprietary, and trade secret information.

324.    There is an inevitability of trade secret disclosure by virtue of the fact that Defendants are directly competing with Plaintiffs, Menkin, Goureau, and Nagrani are filling roles similar to those that they held at ML Fashion, Plaintiffs have sought to protect their trade secret information, and Defendants intend further utilize and misappropriate the trade secrets.

325.    As a direct and proximate cause of Defendants' wrongful conduct, Plaintiffs are threatened with incalculable financial losses, imminent and permanent irreparable harm, loss of the confidentiality of their trade secrets, loss of goodwill, loss of business opportunities, and other continuing harm.

326.    The threatened losses and harm to Plaintiffs are ongoing and cannot be remedied by damages alone.

327.    Plaintiffs have no adequate remedy at law for sufficient compensation for the wrongs committed by Defendants.

328.    Defendants have acted willfully, maliciously, and with reckless disregard to the rights of Plaintiffs justifying an award of punitive or exemplary damages.

**<u>INJUNCTIVE RELIEF</u>**
**(Temporary Restraining Order, Preliminary and Permanent Injunction by Plaintiffs Against All Defendants)**

329.    Plaintiffs hereby repeat and reallege each and every allegation contained in paragraphs 1 through 328 of this Complaint as if fully set forth herein.

330.    As set forth above, Plaintiffs are likely to succeed, and will succeed, on the merits of their claims, because Defendants have blatantly seized Inventory and FFE to which ML Fashion holds sole title under the terms of the LLC Agreement; have seized the Greenwich Property, to which ML Fashion has the exclusive right of possession and for which ML Fashion continues to

be the lessee; have misappropriated ML Fashion's trade secrets on stolen computers; and are operating a competing business in violation of the LLC Agreement.

331.    Plaintiffs are being irreparably harmed by, *inter alia*, the loss of unique fashion inventory; their loss of use of a unique retail location, the Greenwich Property; the damage to ML Fashion's brands and businesses by Defendants' operation of a competing business; the harm to Plaintiffs' reputation and goodwill; the misappropriation of trade secrets which are now being used against ML Fashion in unlawful competition; and the prospect that ML Fashion will be unable to fully perform under the Credit and Security Agreement, jeopardizing the employment of ML Fashion's employees.

332.    Menkin and Goureau expressly conceded in Section 7.7(d) of the LLC Agreement that competition against ML Fashion would cause irreparable harm to ML Fashion, and that ML Fashion could accordingly seek injunctive relief to stop their competitive conduct.

333.    Plaintiffs have no adequate remedy at law because money damages are not sufficient to compensate Plaintiffs for the harms they are suffering and will continue to suffer absent injunctive relief.

334.    The balance of the equities weighs heavily in Plaintiffs' favor because Defendants are willfully breaching the LLC Agreement, willfully disregarding ML Fashion's rights to possession of the Greenwich Property, and willfully engaging in a business in direct competition with ML Fashion.

335.    By reason of the foregoing, Plaintiffs are entitled to an injunction immediately (through temporary restraining order), preliminarily and permanently enjoining Defendants, their officers, partners, members, employees, agents, servants, attorneys, representatives, and all others acting under it or on its behalf, or in concert with it, known or unknown, from: (a) utilizing, selling,

or otherwise disposing of any stolen computers (and any of the information contained on the stolen computers), inventory or FFE at the Greenwich Property; (b) retaining any computer belonging to Plaintiffs; (c) operating a retail business at the Greenwich Property; (d) occupying or possessing the Greenwich Property; (e) engaging in business activities in competition with ML Fashion's business activities, including by operating Nobelle; and (f) using ML Fashion's confidential proprietary, and trade secret information for any purpose.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court enter an Order:

(a)     On the First Cause of Action for Conversion, awarding injunctive relief and all general, specific, actual, economic, and non-economic damages to ML Fashion in an amount to be determined at trial and requiring Defendants to return computers, unsold Inventory and FFE to ML Fashion;

(b)     On the Second Cause of Action for Breach of Fiduciary Duty, awarding injunctive relief and all general, specific, actual, economic, and non-economic damages to ML Fashion in an amount to be determined at trial;

(c)     On the Third Cause of Action for Breach of Contract, awarding injunctive relief and all general, specific, actual, economic, and non-economic damages to ML Fashion and ML Retail in an amount to be determined at trial and requiring Menkin and Goureau to specifically perform their obligations under the LLC Agreement by ceasing the operation of Nobelle and any other business in competition with ML Fashion's businesses;

(d)     On the Fourth Cause of Action for Fraud, awarding all general, specific, actual, economic, and non-economic damages to ML Fashion and ML Retail in an amount to be determined at trial;

(e)     On the Fifth Cause of Action for Tortious Interference with Noncompetition Agreement, awarding all general, specific, actual, economic, and non-economic damages to ML Fashion and ML Retail in an amount to be determined at trial;

(f)     On the Sixth Cause of Action for Aiding and Abetting, awarding damages to ML Fashion and ML Retail in an amount to be determined at trial;

(g)     On the Seventh Cause of Action for False Advertising under the Lanham Act, awarding all general, specific, actual, economic, and non-economic damages to ML Fashion and ML Retail in an amount to be determined at trial and enjoining Defendants' conduct in violation of the Lanham Act;

(h)     On the Eighth Cause of Action for Unfair Competition under the Lanham Act, awarding all general, specific, actual, economic, and non-economic damages to ML Fashion and ML Retail in an amount to be determined at trial and enjoining Defendants' conduct in violation of the Lanham Act;

(i)     On the Ninth Cause of Action for Violation of the Computer Fraud and Abuse Act, awarding all general, specific, actual, economic, and non-economic damages to ML Fashion and ML Retail in an amount to be determined at trial and enjoining Defendants' conduct in violation of the Computer Fraud and Abuse Act;

(j)     On the Tenth Cause of Action for Misappropriation of Trade Secrets under the Defend Trade Secrets Act, awarding damages to ML Fashion and ML Retail (including, without limitation, damages for lost profits, the value of the trade

secrets, a reasonable royalty, head-start damages, and/or unjust enrichment) in an amount to be determined at trial and enjoining Defendants' conduct in violation of the Defend Trade Secrets Act;

(k)    On the Eleventh Cause of Action for Threatened Misappropriation of Trade Secrets under the Defend Trade Secrets Act, awarding all general, specific, actual, economic, and non-economic damages to ML Fashion and ML Retail in an amount to be determined at trial and enjoining Defendants' conduct in violation of the Defend Trade Secrets Act;

(l)    On the request for Injunctive Relief, enjoining Defendants, their officers, partners, members, employees, agents, servants, attorneys, representatives, and all others acting under it or on its behalf, or in concert with it, known or unknown, from: (a) utilizing, selling, or otherwise disposing of any computers, inventory, or FFE at the Greenwich Property and returning same to Plaintiffs; (b) retaining any computer belonging to Plaintiffs and returning same to Plaintiffs; (c) operating a retail business at the Greenwich Property; (d) occupying or possessing the Greenwich Property; (e) engaging in business activities in competition with ML Fashion's business activities, including by operating Nobelle; (f) destroying, erasing, disposing of, or otherwise making unavailable for further proceedings in this matter, any discoverable records, documents, or information (including data or information maintained in electronic format or on computer media) pending the outcome of this lawsuit; (g) using ML Fashion's confidential proprietary, and trade secret information for any purpose and returning same to Plaintiffs; (h) allowing expedited discovery, including but not limited to document production, forensic

review, and depositions of all persons and entities necessary to uncover the extent of each Defendants' unlawful conduct;

(m)     Awarding judgment that Defendants are in violation and liable under each of the above Counts;

(n)     Awarding compensatory damages in an amount to be proved after the discovery of all relevant evidence and trial;

(o)     Award the disgorgement of all improperly gained monies by Defendants;

(p)     Awarding exemplary, punitive and other monetary damages allowed by law and equity;

(q)     Awarding all statutory double and treble damages permitted by law;

(r)     Awarding Plaintiffs their reasonable attorneys' fees and costs incurred in connection with this action and the enforcement of their rights;

(s)     Costs and expenses in this action; and

(t)      For such other and further relief as the Court deems just and proper.

Dated:  April 9, 2021                      SEYFARTH SHAW LLP

                                           By: */s/ Karen Y. Bitar*
                                               Karen Y. Bitar
                                           620 Eighth Avenue
                                           New York, New York 10018
                                           Telephone: (212) 218-5500

                                           Michael D. Wexler (*pro hac vice* to be filed)
                                           Willis Tower
                                           233 S. Wacker Drive, Suite 8000
                                           Chicago, Illinois 60606-6448
                                           Telephone:  (312) 460-5559

                                           Jesse M. Coleman (*pro hac vice* to be filed)
                                           700 Milam Street, Suite 1400
                                           Houston, Texas  77002
                                           (713) 238-1805


                                           *Attorneys for Plaintiffs ML Fashion, LLC and
                                           ML Retail, LLC*