## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| ML FASHION, LLC, and ML RETAIL, LLC, | : | |
| Plaintiffs, | : | CIVIL CASE NO. |
| | : | 3:21-CV-00499 (JCH) |
| v. | : | |
| | : | |
| NOBELLE GW, LLC, STEPHANIE | : | |
| MENKIN, SARIT MAMAN NAGRANI, | : | FEBRUARY 2, 2022 |
| and NICOLAS GOUREAU, | : | |
| Defendants. | : | |

**RULING ON DEFENDANTS' MOTION FOR COSTS AND FOR A STAY OF PROCEEDINGS (DOC. NO. 31), MOTION TO DISMISS (DOC. NO. 33), AND MOTION TO STAY DISCOVERY (DOC. NO. 57), AND PLAINTIFFS' MOTION TO AMEND THE SCHEDULING ORDER (DOC. No. 94)**

## I.  INTRODUCTION

Plaintiffs ML Fashion, LLC, and ML Retail, LLC, bring this action alleging eleven separate causes of action against defendants Nobelle GW, LLC, ("Nobelle"), Stephanie Menkin ("Menkin"), Sarit Maman Nagrani ("Nagrani"), and Nicolas Goureau ("Goureau"), all related to the opening of Nobelle, a retail fashion store.  Pending before the court are four separate motions - three by defendants and one by plaintiffs – all of which this Ruling resolves.

First, pursuant to Rule 41(d) of the Federal Rules of Civil Procedure ("Rule 41(d)"), defendants have moved for the court to order plaintiffs to pay certain costs associated with a previously filed action in the pUnited States District Court for the Northern District of Illinois.  They also seek a stay of the proceedings in this court until plaintiffs pay those costs.  See Defs.' Mot. for Costs and for a Stay of Proceedings Pending Pls.' Payment of Those Costs Pursuant to Fed. R. Civ. P. 41(d) (Doc. No. 31); Defs.' Mem. of Law in Supp. of Defs.' [Mot.] for Costs and for a Stay of Proceedings

Pending Pls.' Payment of Those Costs Pursuant to Fed. R. Civ. P. 41(d) ("Defs.' R. 41(d) Mem.") (Doc. No. 31-1); Defs.' Reply in Further Supp. of Their Mot. for Costs and for a Stay of Proceedings Pending Pls.' Payment of Those Costs Pursuant to Fed. R. Civ. P. 41(d) ("Defs.' R. 41(d) Reply") (Doc. No. 45).  Plaintiffs oppose this Motion.  See Pls.' [ ] Mem. of Law in Opp'n to Def.'s Mot. for Costs and for a Stay of Proceedings Pending Pls.' Payment of Those Costs Pursuant to Fed. R. Civ. P. 41(d) ("Pls.' R. 41(d) Mem.").

Second, defendants have moved to dismiss the Complaint in its entirety.  See Defs.' Mot. to Dismiss the Compl. (Doc. No. 33); Defs.' Mem. of Law in Supp. of Their Mot. to Dismiss the Compl. ("Defs.' Mot. to Dismiss Mem.") (Doc. No. 33-1); Defs.' Reply Mem. of Law in Further Supp. of Their Mot. to Dismiss the Compl. ("Defs.' Mot. to Dismiss Reply") (Doc. No. 60).  Plaintiffs also oppose this Motion.  See Pls.' [ ] Mem. of Law in Opp'n to Defs.' Mot. to Dismiss the Compl. ("Pls.' Mem. in Opp'n to Mot. to Dismiss") (Doc. No. 44).

Third, defendants have also moved to stay discovery "pending the resolution of Defendants' [ ] Motion to Dismiss."  See Defs.' Mot. to Stay Discovery (Doc. No. 57).  Plaintiffs oppose this Motion as well, and have cross-moved for this court to impose sanctions on defendants for their alleged failure to confer with plaintiffs before filing their Motion.  See Pls.' Mem. of Law in Opp'n to Defs.' Mot. to Stay Discovery and in Supp. of Request for Sanctions (Doc. No. 61).

Finally, plaintiffs have moved for an extension of time and to amend the scheduling order by extending all deadlines by 120 days.  See Pls.' Mot. for Extension

of Time and to Amend Scheduling Order ("Mot. to Amend Scheduling Order") (Doc. No. 94).  This Motion is unopposed.  Id. at 1.

For the reasons set forth below, the court: (1) grants defendants' Motion for plaintiffs to pay certain costs associated with the Illinois Action; (2) denies their Motion to stay proceedings until those costs are paid; (3) grants in part and denies in part defendants' Motion to Dismiss while ordering limited jurisdictional discovery as to defendant Goureau; (4) terminates their Motion to Stay Discovery as moot; (5) denies plaintiffs' cross-Motion for sanctions, and; (6) grants plaintiffs' unopposed Motion to Amend the Scheduling Order.

## II.    FACTUAL ALLEGATIONS[1]

In or around 2014, defendants Menkin and Goureau went on a CNBC television series called "The Profit" to solicit an investment from its presenter, Marcus Lemonis ("Lemonis").  Compl. at ¶¶ 13-14.  At the time, Menkin and Goureau were operating a failing fashion retail business operating under the brand name "Courage.B."  Id. at ¶ 13. During their appearance on the show, Menkin and Goureau admitted that Courage.B had lost more than $500,000 in the previous year and that they had just resolved a lawsuit against their stepfather involving the business.  Id. at ¶ 15.  After discussion, Lemonis agreed to invest $800,000 in the company to allow it to purchase inventory and pay other fees.  Id. at ¶ 16.  In exchange, ML Retail – for which Lemonis serves as managing member – received and ownership stake in Menkin and Goureau's business. Id.

---

[1] The court the alleged facts from plaintiffs' Complaint.

The business proceeded to expand, acquiring new brands and opening new stores over the course of the next two years.  Id. at ¶¶ 17-18.  In or around 2016, Menkin, Goureau, and ML Retail formed ML Fashion, a new LLC, for the purposes of overseeing and operating their still-expanding fashion retail business.  Id.  Lemonis, as ML Retail's managing member, signed the LLC Agreement on its behalf.  Id. at ¶ 16, 22. Pursuant to the LLC Agreement, ML Retail owns a 33.34% stake in ML Fashion, and Lemonis is also its managing member, chairman, and CEO.  Id. at ¶¶ 20, 23-24. Menkin and Goureau, for their part, each own a 33.33% membership interest in ML Fashion, and Menkin serves as its president.  Id. at ¶ 23-24.  However, as managing member, the management of ML Fashion is "vested entirely and exclusively" in Lemonis, and neither Menkin nor Goureau have a right to participate in the management or control of ML Fashion, or to act for it or bind it in any way.  Id. at ¶ 27. ML Fashion itself holds title to all of its property, and no member has an individual ownership interest in that property.  Id. at ¶ 26.  Finally, the LLC Agreement also includes a non-compete clause that applies to each member for twelve months once their membership is terminated.  Id. at ¶¶ 30-31.

In or around 2016, Menkin and Goureau opened ML Fashion's first store in Lake Forest, Illinois.  Id. at ¶ 33.  The business would continue to grow over the next few years, operating more than thirty retail stores across the country at its peak, including a store called "MARCUS" in Greenwich, Connecticut, and another in New York City's Meatpacking District.  Id. at ¶¶ 34-36.  Defendant Nagrani, an ML Fashion employee at the time, managed both of these stores.  Id. at ¶ 1, 36.  Plaintiffs allege that these stores were in the same retail market, as "[m]any Greenwich residents do their fashion-related

4

shopping in both Greenwich and New York City", and that Menkin, Goureau, and Nagrani agreed that the two stores were operating in the same market.  Id. at ¶¶ 37-40.

Then the COVID-19 pandemic hit.  On or about December 22, 2020, ML Fashion closed the New York City store, although it has still not relinquished the property to the landlord.  Id. at ¶ 41.  It also stopped selling clothing and other fashion-related retail products from the Greenwich store in or around March 2020, although ML Fashion alleges it still owns the fixtures, furniture, and equipment located on the property.  Id. at ¶¶ 42-44.  However, when it attempted to retrieve that property from the Greenwich location – which served as collateral for a multi-million dollar loan from ML Retail to ML Fashion – plaintiffs allege that the employee in charge of the removal was threatened by Goureau and prevented from doing so.  Id. at ¶ 45, 49.  ML Fashion still holds the lease on the Greenwich property, and has never authorized anyone else to operate there.  Id. at ¶ 47.

During this time, in or around early 2020, Lemonis began discussions with Menkin and Goureau about their potential exit from ML Fashion.  Id. at ¶ 56.  These negotiations included proposals for both Menkin and Goureau to exchange all their equity in ML Fashion for mutually agreeable inventory.  Id. at ¶¶ 56-57.  Plaintiffs allege that, during the conversations surrounding their exits, Menkin and Goureau made numerous misrepresentations.  Id. at ¶ 58.  For instance, they allegedly said that they would not take ML Fashion inventory or property without its approval, nor would they take actions to compete with or harm the company.  Id. at ¶ 59.

According to plaintiffs, however, Menkin and Goureau did just that.  They never transferred any equity to Lemonis and ceased all communication with him in early 2020.

Id. at ¶ 62.  In addition, plaintiffs allege that "as the end of her tenure at ML Fashion became clear, Menkin" – who was ML Fashion's President and oversaw its retail operations and other endeavors – "utilize[d] her position . . . to unduly influence ML Fashion employees and misappropriate ML Fashion inventory."  Id. at ¶¶ 53, 66.  More specifically, Menkin formed Nobelle with defendant Nagrani, and then, without authorization, took "at least 3,922 items of clothing and other merchandise from ML Fashion with a wholesale cost of at least $109,443.93, and a retail value of at least $207,473.90."  Id. at ¶ 67.  Based on plaintiffs' investigations to date, they believe both Menkin and Nagrani used their positions at ML Fashion to "cover their tracks" as they implemented this scheme, "including by potentially deleting or altering ML Fashion inventory records."  Id. at ¶ 68.

One instance of this alleged conduct occurred in January 2020, when Front Door Fashion ("FDF") contacted ML Fashion to return 1,296 items that it had been working to sell online on ML Fashion's behalf.  Id. at ¶¶ 69-71.  Instead of providing FDF with an ML Fashion address to send the items, Menkin allegedly told them to send the items to a location in New York where her mother, Noemi Goureau, operated a store that plaintiffs identify only as the "Noemi Store."  Id. at ¶¶ 75-76.  Menkin did not have the authority to divert the shipment to the Noemi store, nor did she have any reason to do so except to use the merchandise for her own personal purposes.  Id. at ¶ 77.  Later that same month, Menkin allegedly directed that an additional 2,769 items be shipped from the ML Fashion warehouse to the Noemi Store, and she did the same twice more in early February with an additional 375 items.  Id. at ¶¶ 82, 88, 91.  These shipments included brands exclusive to ML Fashion and not authorized to be carried, marketed, or

sold by other retailers.  Id. at ¶¶ 108-09.  She did all of this without notifying ML Fahsion, and plaintiffs "believe that Nagrani, as Menkin's business partner and a former ML Fashion employee, assisted Menkin" in her endeavors.  Id. at ¶¶ 83, 93.

This was all happening around the time, in 2020, when defendants Menkin, Goureau, and Nagrani formed Nobelle, which plaintiffs allege was a competing retail clothing store.  Id. at ¶ 100.  In or around August 2020, they began occupying the Greenwich location in Connecticut under the Nobelle brand name and selling there the inventory that Menkin had allegedly stolen.  Id. at ¶ 101.  This was done without ML Fashion's consent and while the company was still operating its New York store in what plaintiffs believe was the same retail market.  Id. at ¶ 102.  Nobelle also promoted the Greenwich store and its brand on its website and through social media, depicting the real property, stolen products, and fixtures, furniture, and equipment in the store as its own.  Id. at ¶ 103.  Nobelle also sells items identical to the ones sold by ML Fashion and procured from the exact same vendors, and plaintiffs allege that the online postings for these items are identical on Nobelle's site "down to the prices and the photographs and text descriptions of the products."  Id. at ¶¶ 114-15.  Taken together, plaintiffs assert that "Nobelle is sowing confusion in the marketplace, causing consumers and others in the industry to believe that Nobelle is a subsidiary of, [or] otherwise affiliated with, [p]laintiffs or with Lemonis personally."  Id. at 125.  And these efforts have, according to plaintiffs, been successful.  "Since in or about late 2020, ML Fashion has been receiving calls from vendors about unpaid bills or about where to ship certain goods that have turned out to be for Nobelle."  Id. at ¶ 132.  This has led the company to "believe that vendors are extending credit to Nobelle for trade goods based upon [their] mistaken

assumption that Nobelle's debts are being backed by Lemonis or by [p]laintiffs." <u>Id.</u> at 133.

Moreover, plaintiffs allege that, during defendants' departure from ML Fashion, one of them – "presumably Menkin or someone acting at [her] direction" – took with them two ML Fashion computers with "sensitive, confidential, and trade secret information" owned by the company. <u>Id.</u> at ¶¶ 143-44.  These computers allow defendants to, <u>inter alia</u>, view ML Fashion customer information, information regarding its profitability year-over-year, and the company's banking information. <u>Id.</u> at ¶¶ 149-50. Plaintiffs also allege that Goureau logged onto one of the computers and attempted to install Nobelle software onto it, while also "sever[ing] [p]laintiffs' ability to access the computers remotely, impairing their ability to access data on the computers and also preventing them from seeing what [d]efendants were doing with the computers." <u>Id.</u> at ¶¶ 153-55.  The second computer was also accessed by someone at Nobelle in late August, and plaintiffs spent over $5,000 in employee time investigating the theft and misuse of the computers before their access was cut off. <u>Id.</u> at ¶¶ 157, 173.

## III.    PAST LAWSUITS AND PROCEDURAL HISTORY

These ongoing disputes led the same plaintiffs to file suit against these same defendants on August 31, 2020, in the United States District Court for the Northern District of Illinois (the "Illinois Action"). <u>Id.</u> at ¶ 183; <u>see also</u> Compl., <u>ML Fashion, LLC et al. v. Nobelle et al.</u>, No. 1:20-CV-05124 (N.D. Ill. Aug. 31, 2020) ("<u>N.D. Ill. Action</u>") (Doc. No. 1).  That was not the first lawsuit between the parties, and it would not be the last.  Indeed, the instant case is one of seven such actions stemming from Menkin and Goureau's appearance on "The Profit" and their subsequent business relationship with Lemonis.

8

A.      The Delaware and New York Actions

The first two cases were both filed on June 18, 2020, in the Court of Chancery of the State of Delaware and the United States District Court for the Southern District of New York, respectively.  See Verified First Am. Compl., Nicholas Goureau v. Marcus Lemonis et al., No. 2020-0486, 2020 WL 5076640 (Del. Ch. Aug. 25, 2020); Compl., Goureau et al. v. Lemonis et al., No. 1:20-CV-04691 ("S.D.N.Y. Action") (S.D.N.Y. June 18, 2020).  Both these cases were brought by Goureau and Menkin against Lemonis and other entities he controlled.  In the Delaware action, they asserted both individual and derivative claims on behalf of ML Fashion itself, while in the S.D.N.Y. case, they asserted both individual and derivative claims on behalf of the corporation the two had owned before going on "The Profit."  Goureau v. Lemonis, No. 2020-0486, 2021 WL 1197531, at *1 (Del. Ch. Mar. 30, 2021).  While those entities were different, fundamentally the allegations in the two cases were essentially the same: Goureau and Menkin claimed that, "[b]efore the ink dried on Lemonis' investment" in their company, he began a scheme whereby he "overload[ed] [them] with debt, and then us[ed] that leverage to mismanage their businesses for his [own] benefit."  Id.

In the Delaware action, "[d]efendants moved to dismiss on several grounds, including that plaintiffs' overlapping complaints [in the two courts] violate[d] the rule against claim splitting."  Id.  In March 2021, the Delaware court agreed that plaintiffs had improperly split their claims by bringing their action based on the same set of facts in two separate courts, and as such stayed the Delaware action pending resolution of the New York one.  Id. at 8.

In the meantime, the New York action continued to move forward.  After Goureau and Menkin filed a First Amended Complaint, defendants moved to dismiss the case in

its entirety.  Goureau v. Lemonis, No. 1:20-CV-04691, 2021 WL 3931897, at *1

(S.D.N.Y. Sept. 2, 2021).  Judge Vyskocil granted the Motions to Dismiss "with respect

to the fraud-based and RICO claims alleged in the Amended Complaint", and because

"federal jurisdiction [was] predicated on the RICO claim", declined "to exercise

jurisdiction over the remaining state level claims alleged in the Amended Complaint."

Id. at *5-6.  Goureau and Menkin then moved for reconsideration of that Ruling, arguing

that, although the Amended Complaint had "predicated jurisdiction on federal question

with respect to its RICO claims, [it also] did later make factual assertions that

support[ed] diversity jurisdiction."  Goureau v. Lemonis, No. 1:20-CV-04691, 2021 WL

4847073, at *1 (S.D.N.Y. Oct. 15, 2021).  Though the court held that the factual

pleadings sufficient to establish diversity jurisdiction meant that reconsideration was

warranted, it still dismissed the Amended Complaint in its entirety for failure to state a

claim upon which relief could be granted.  Id.  However, in its Ruling, the court also

noted plaintiffs' intent to move for leave to file a Second Amended Complaint and

provided that any such Motion "shall be filed on or before November 19, 2021."  Id. at

*7.

On November 19, however, Goureau and Menkin filed a notice that they were

voluntarily dismissing the case without prejudice pursuant to Rule 41(a)(1)(A)(i) of the

Federal Rules of Civil Procedure.  See Notice of Voluntary Dismissal, S.D.N.Y. Action

(S.D.N.Y. Nov. 19, 2021) (Doc. No. 91).[2]  Defendants strenuously opposed that filing,

arguing that a Rule 41 voluntary dismissal after the court had already dismissed the

---

[2] Of note, the purported Rule 41 dismissal applied only to Goureau and Menkin' individual claims
in the S.D.N.Y. action.  In its November 19 Notice, the plaintiffs also stated that they would move
separately under Federal Rule 23(c) to voluntarily dismiss their derivative claims.  Id.

Complaint was improper.  <u>See</u> Resp. Regarding Notice of Voluntary Dismissal and Letter-Mot. for Ext., <u>S.D.N.Y. Action</u> (S.D.N.Y. Nov. 22, 2021) (Doc. No. 97).  They urged the court to strike the Notice and enter judgment dismissing the action with prejudice.  <u>Id.</u>

The court did enter judgment that same day.  <u>See</u> Judgment, <u>S.D.N.Y. Action</u> (S.D.N.Y. Nov. 22, 2021) (Doc. No. 99).  However, it did not strike the Rule 41 Notice and was otherwise silent on the issue of prejudice.  Noting only that "[p]laintiffs did not seek leave to amend and instead filed a notice of voluntary dismissal", the court directed the Clerk to close the case because no Motion to Amend had been filed before the November 19 deadline.  <u>Id.</u> at 2.  Shortly thereafter, Goureau and Menkin moved for "an Order clarifying as to whether the judgment rendered . . . effectuates dismissal of the claims included therein with or without prejudice."  Pls.' Mot. for Clarification And/Or for An Order Altering or Amending J., <u>S.D.N.Y. Action</u> (S.D.N.Y. Dec. 9, 2021).  In the meantime, on the same day they noticed their dismissal of the S.D.N.Y. case, Goureau and Menkin brought a third action in the Supreme Court of the State of New York arising from the same set of facts against Lemonis and other defendants.  <u>See</u> Ex. A, Compl., <u>S.D.N.Y. Action</u> (S.D.N.Y. Nov. 19, 2021) (Doc. No. 94-1).

On December 14, 2021, Judge Vyskocil denied Goureau and Menkin's Motion to Alter the Judgment.  <u>See</u> <u>S.D.N.Y. Action</u> (S.D.N.Y. Dec. 14, 2021) (Doc. No. 105).  After finding that they had "ignore[ed] a Court-imposed deadline to seek leave to amend", the court clarified that the dismissal of their case was "with prejudice and on the merits."  <u>Id.</u> at 2, 4.  Nor did the court take kindly to Goureau and Menkin's deceptive tactics in "fil[ing] a purported notice of voluntary dismissal" after it had already rendered

judgment on the Motion to Dismiss.  Id.  "Allowing such maneuvering", the court

concluded, "would be a manifest waste of judicial resources and would permit

prospective plaintiffs to dismiss with impunity a fully litigated complaint when they do not

like the result.  Such a result would be untenable and contrary to notions of fair play and

judicial economy."  Id. at 5.

      B.     The Illinois Actions

     A fourth case (in non-chronological order) related to Goureau and Menkin's

appearance on "The Profit" was the aforementioned Illinois Action, filed on August 31,

2020, approximately two and a half months after Goureau and Menkin had filed the

Delaware and S.D.N.Y. suits.[3]  Although the Verified Amended Complaint in that case

contains some differences from the operative Complaint here, they are virtually identical

in many respects and include the exact same parties.  Compare Am. Verified Compl.

and Application for Immediate Prelim., and Permanent Inj. Relief, N.D. Ill. Action (N.D.

Ill. Nov. 16, 2020) (Doc. No. 35), with Compl; see also Pls.' R. 41(d) Mem. at 23; Compl.

at ¶ 207 (conceding that "the underlying facts" in the two cases "are the same" and that

they are simply "re-filing their claims in this [c]ourt").

---

[3] The fifth case was brought in state court in Illinois shortly after the federal action in the Northern District of Illinois was filed.  In that case, ML Fashion and ML Retail brought an action against Goureau, Menkin, and Noemi Goureau related to the use of a company credit card.  The Circuit Court of Cook County dismissed that action for lack of personal jurisdiction and, upon a Motion for Reconsideration by ML Fashion and ML Retail, affirmed that Ruling on June 15, 2021.  See Defs.' Notice of New Authority in Further Supp. of Their Mot. for Costs and Fees and for a Stay of Proceedings (Doc. No. 55).  The claims brought in that case do not appear to be presented in the action before this court.

     It does appear, however, that ML Fashion and ML Retail filed yet another case in New York state court asserting the same claims they had raised in the Cook County Action on November 2, 2021.  See Defs.' Second Notice of New Authority at 1 n. 1 (Doc. No. 96).  This New York action – the sixth case arising from Goureau and Menkin's business relationship with Lemonis – brought "the same claims that were originally part of the [Illinois Action], which Plaintiffs then tried to take to Cook County, Illinois state court, only to be thrown out for lack of personal jurisdiction."  Id.  According to defendants, they have now filed those same claims in New York state court.

In the Illinois Action, however, plaintiffs moved for a temporary restraining order and a preliminary injunction to prevent defendants from operating Nobelle and using and selling the plaintiffs' property.  See ML Fashion, LLC v. Nobelle GW, LLC, No. 20-CV-5124, 2021 WL 170741, at *1 (N.D. Ill. Jan. 19, 2021).[4]  That Motion was denied by the court in January 2021.  Id.  In doing so, Judge Seeger noted that "[t]he gist of the lawsuit [was] that Nobelle is a competing business (in violation of the non-compete) and is expropriating the property of ML Fashion."  Id. at *3.  He then concluded that the plaintiffs had failed to meet any of the three requirements for a TRO or preliminary injunction.  This was because "[p]lenty of question marks cast a shadow over the[ir] likelihood of success" on the merits.  Id. at *5.  In addition, they had "an adequate remedy at law, and . . . would suffer no irreparable injury in the meantime" absent the court providing emergency relief.  Id.  In sum, Judge Seeger found that "the windy complaint [felt] overblown."[5]

After the court issued its opinion, the parties continued to litigate the defendants' Motion to Dismiss the Verified Amended Complaint, as well as a separate Motion to Stay the Illinois Action pending the resolution of the Delaware one filed by defendants. These Motions were both joined by March 26, 2021, when ML Fashion and ML Retail

---

[4] In the operative Complaint in this case, plaintiffs have included language indicating that they intended to move for a temporary restraining order and preliminary injunction here as well.  See Compl. at 54 (entitling a section of the Complaint "Injunctive Relief (Temporary Restraining Order, Preliminary and Permanent Injunction by Plaintiffs Against All Defendants)" and in the subsequent paragraphs explaining why they are likely to succeed on the merits of their claims).  This appears to be copied and pasted from the Verified Amended Complaint in the Illinois Action, but plaintiffs have not moved for emergency relief here.

[5] To be sure, plaintiffs appear to have taken Judge Seeger's analysis to heart and attempted to correct some of the deficiencies in the Illinois Action Complaint in their Complaint here.  For instance, Judge Seeger noted the lack of specificity regarding plaintiffs' allegations about stolen inventory.  See id. at *5 ("[t]he Court is left wondering what inventory was taken, and when, and how, and how much it is worth").  In contrast, the Complaint here answers all of these questions.  Compl. at ¶¶ 65-95.

noticed their voluntary dismissal of the Illinois Action under Rule 41.  See Notice of

Voluntary Dismissal by Plaintiffs, N.D. Ill. Action (N.D. Ill. Mar. 26, 2021) (Doc. No. 70).

Because such a notice is self-effectuating, the court terminated the case the next day.

Minute Entry, N.D. Ill. Action, (N.D. Ill. Mar. 27, 2021) (Doc. No. 71).

 However, as it always seems to be the case with these parties, the litigation in

Illinois did not end there.  Two weeks after Judge Seeger closed the Illinois Action,

defendants filed a Motion urging the court to impose sanctions on plaintiffs for their

"egregious conduct" – namely, litigating their case extensively before using Rule 41 to

dismiss it without prejudice, but only after inflicting substantial costs on defendants.

Defs.' Mem. of Law in Supp. of Their Mot. for an Order Awarding Sanctions Under 28

U.S.C. § 1927 and the Court's Inherent Authority at 1, N.D. Ill. Action (N.D. Ill. Apr. 12,

2021) (Doc. No. 73).[6]  The basis for their Motion is, inter alia, section 1927 of title 28 of

the United States Code, which provides that "[a]ny attorney or other person . . . who so

multiplies the proceedings in any case unreasonably and vexatiously may be required

by the court to satisfy personally the excess costs, expenses, and attorneys' fees

reasonably incurred because of such conduct."  28 U.S.C. § 1927.

 On December 20, 2021, Judge Seeger denied defendants' Motion.  See Defs.'

Ex. 1, Minute Entry (Doc. No. 96-1).  In doing so, he noted the "considerable bad blood

between the parties" and expressed "concerns about how litigation between [them] has

metastasized and spread across the country."  Id. at 1-2.  He also characterized

---

[6] Of course, several months after Nobelle, Menkin, Goureau, and Nagrani filed this Motion
seeking sanctions for "multiplying proceedings in courts across the country", they attempted to use Rule
41 to dismiss the S.D.N.Y. action without prejudice after that court had already ruled on a Motion to
Dismiss.  See id. at 1; supra Section III.A.  They have also filed a separate action arising from the same
set of facts in the Supreme Court of the State of New York.  See supra Section III.A.

plaintiffs' personal jurisdictional argument as "flimsy" and their decision to file in Illinois, far away from defendants' store in Connecticut, as "perhaps gratuitous." Id. at 1. However, because "sanctionable conduct is a pretty high bar", and there was not "much of a basis for a finding of subjective bad faith, other than speculation", the Motion was denied. Id. at 1-2.

## IV.    STANDARD OF REVIEW

### A.    Rule 12(b)(6)

To withstand a motion to dismiss filed pursuant to Federal Rule of Civil Procedure 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007)).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id.  The plausibility standard is not a probability requirement; the pleading must show, not merely allege, that the pleader is entitled to relief. Id.  Legal conclusions and "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements", are not entitled to a presumption of truth. Id.  However, when reviewing a motion to dismiss, the court must accept the factual allegations in the operative complaint as true and draw all reasonable inferences in the non-movant's favor.  See Graziano v. Pataki, 689 F.3d 110, 114 (2d Cir. 2012).

### B.    Rule 9(b)

Rule 9(b) requires that, in alleging fraud, a party must "state with particularity the circumstances constituting fraud."  Fed. R. Civ. P. 9(b).  A Complaint alleging fraud must ordinarily: "(1) specify the statements that the plaintiff contends were fraudulent,

(2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent."  Rombach v. Chang, 355 F.3d 164, 170 (2d Cir. 2004) (internal quotations and citations omitted).  However, "the adequacy of particularized allegations under Rule 9(b) is . . . case- and context-specific."  United States ex rel. Chorches for Bankruptcy Estate of Fabula v. Am. Med. Resp., Inc., 865 F.3d 71, 81 (2d Cir. 2017) (internal quotations and citations omitted).  "Despite the generally rigid requirement [of Rule 9(b)], allegations may be based on information and belief when facts are peculiarly within the opposing party's knowledge."  Id. at 81-82 (internal quotations and citations omitted).  "Pleading on information and belief" is therefore "a desirable and essential expedient when matters that are necessary to complete the statement of a claim are not within the knowledge of the plaintiff but he has sufficient data to justify interposing an allegation on the subject."  Id. at 82 (internal quotations and citations omitted).  When pleading on information and belief, a Complaint must "adduce specific facts supporting a strong inference of fraud."  Id. (internal quotations and citations omitted).

Rule 9(b) also provides that "[m]alice, intent, knowledge, and other conditions of a person's mind may be alleged generally."  Fed. R. Civ. Pro. 9(b).  "The second circuit has recognized that the requisite intent of the alleged speaker of the fraud need not be alleged with great specificity . . . for the simple reason that a plaintiff realistically cannot be expected to plead a defendant's actual state of mind."  Conn. Gen. Life Ins. Co. v. True View Surgery Ctr. One, LP, 128 F. Supp. 3d 501, 507-08 (D. Conn. 2015) (internal quotations and citations omitted).

C.      Rule 41(d) Motion

The court reviews the Complaint for the purposes of the Rule 41(d) Motion in the same manner as it would a motion to dismiss, accepting factual allegations as true and drawing reasonable inferences in plaintiffs' favor.  See Horowitz v. 148 S. Emerson Assocs. LLC, 888 F.3d 13, 16 n.1 (2d Cir. 2018) (accepting a complaint's factual allegations as true for the purposes of a motion to dismiss and a Rule 41(d) motion). The court also considers "the records and decisions in the various judicial proceedings involving the parties . . . [because these] are facts of which [the court] may take judicial notice."  Id.

## V.      RULE 41(d) MOTION FOR COSTS AND A STAY OF PROCEEDINGS

A.      Rule 41(d)

Federal Rule of Civil Procedure 41(a)(1)(A)(i) permits a plaintiff to "dismiss an action without a court order by filing [ ] a notice of dismissal before the opposing party serves either an answer or a motion for summary judgment."  Fed. R. Civ. P. 41(a)(1)(A)(i).  Rule 41(d), however, imposes an additional condition on the power given to plaintiffs in Rule 41(a)(1)(A)(i).  Pursuant to Rule 41(d), "[i]f a plaintiff who previously dismissed an action in any court files an action based on or including the same claim against the same defendant, the court [ ] may order the plaintiff to pay all or part of the costs of that previous action."  Fed. R. Civ. P. 41(d).  Rule 41(d) also authorizes a court, in its discretion, to "stay the proceedings until the plaintiff has complied."  Id.  In the Second Circuit, "the costs of [a] previous action" include attorneys' fees.  Horowitz, 888 F.3d at 26.

"Rule 41(d)'s purpose is clear and undisputed: to serve as a deterrent to forum shopping and vexatious litigation."  Id. at 25 (internal quotations and citations omitted).

17

Appropriate "targets of deterrence under [Rule 41(d)]" include "litigants . . . that file complaints and quickly dismiss them, perhaps in reaction to initial unfavorable rulings, or hoping for a subsequent case assignment to a judge they view as more favorable." Id. at 26.  However, "[t]here is no requirement in Rule 41(d) or the relevant case law that a defendant must show bad faith on the part of the plaintiff in order to recover costs." Lombardo v. R.L. Young, Inc., No 3:18-CV-188, 2018 WL 6727356, at *2 (D. Conn. Dec. 21, 2018) (quoting Loubier v. Modern Acoustics, Inc., 178 F.R.D. 17, 22 (D. Conn 1998)); see also Adams v. N.Y. State Educ. Dep't, 630 F. Supp. 2d 333, 344 (S.D.N.Y. 2009) (observing that bad faith is not required but may be considered by a court determining whether to impose costs under Rule 41(d)).

Rather, Rule 41(d) requires only that a defendant establish that "a plaintiff who previously dismissed an action in any court [has] file[d] an action based on or including the same claim against the same defendant."  Fed. R. Civ. P. 41(d).  The Second Circuit has interpreted the phrase "based on" to encompass "actions [that] involve different theories of recovery" or different causes of action.  Horowitz, 888 F.3d at 23.  Thus, in Horowitz, it was "quite clear" to the Second Circuit that an action filed in Georgia state court for breach of contract, unjust enrichment, and quantum meruit was "based on . . . the same claim[s]" as a later action filed in the U.S. District Court for the Eastern District of New York asserting violations of the Lanham Act.  Id. at 17-18, 23.  As the Second Circuit explained, "[the plaintiff]'s claims in both actions depend[ed] on the same core showing about the same trademarks."  Id. at 23.

The question of whether it is appropriate to award costs to a defendant pursuant to Rule 41(d) is routinely treated by courts as a separate and distinct question from the

actual amount of those costs.  See, e.g., Ruling on Defs.' Mot. for Costs, Fees, and

Designation of Pl. as Vexatious Litigant at 31, MSP Recovery Claims, Series LLC v.

Hartford Fin. Services Group, Inc., et al., No. 3:20-CV-00305 (D. Conn. Mar. 2, 2021)

(Doc. No. 47) ("order[ing] the plaintiff to pay certain costs, including attorneys' fees,

associated with the previously filed actions" and "direct[ing] the parties to brief the

appropriate amount of such costs"); MSP Recovery Claims, Series LLC v. Hartford Fin.

Services Group, Inc., et al., No. 3:20-CV-00305, 2021 WL 5563982, at *1 (D. Conn.

Nov. 29, 2021) (following briefing, "order[ing] plaintiff to pay $307,210.76 associated

with the [ ] previously filed actions").  This is in part because courts must "develop the

factual record necessary" to determine the precise amount of fees that are appropriate

in each case, and it is only practical to embark on such an endeavor after the court has

ruled on the Rule 41(d) Motion and found that an award of costs is indeed warranted.

MSP Recovery Claims, 2021 WL 5563982, at *3.

　　　　Finally, the decision to stay proceedings or "award [ ] costs under Rule 41(d) is

discretionary with the court."  Loubier, 178 F.R.D. at 22; see also Fed. R. Civ. P. 41(d)

("the court [ ] may order the plaintiff to pay . . . costs" and, separately, "may stay the

proceedings") (emphasis added).  While courts are limited to assessing costs incurred

in only the prior suit – here, the Illinois Action – a district court's discretion to decide in

the first instance if an award costs is appropriate is "not limited to considering only the

circumstances surrounding th[at] one lawsuit."  Loubier, 178 F.R.D. at 22-23.  This is

especially true when the "litigation has a long and tortuous history."  Id. at 23.  In other

words, the court here has wide latitude to consider all of the circumstances that have

brought the parties before it in this case, and its decision on whether to award costs is

"'completely discretionary.'"  <u>Adams</u>, 630 F. Supp. 2d at 344 (quoting 9 Wright & Miller,

<u>Federal Practice and Procedure: Civil 3d</u> § 2375).  In light of that broad discretion, even

where a plaintiff may be subjected to costs and fees by the plain language of Rule

41(d), a court may decline to enter such an order "'if it appears that there was a good

reason for the dismissal of the prior action.'"  <u>Id.</u>

      B.    <u>Analysis</u>

      Plaintiffs do not dispute that they have run afoul of Rule 41.  They freely admit –

and the record reflects – that they voluntarily dismissed the Illinois Action pursuant to

Rule 41(a)(1)(A)(i) and "re-file[d] the[ ] [same] claims in this court."  Compl. at ¶¶ 206-

07.  Rather than attempt to refute these facts, plaintiffs ask the court to use its discretion

to determine that "[a]n award of costs and a stay are not warranted because [p]laintiffs

withdrew [the Illinois Action] due to meritless jurisdictional delays and filed in this [c]ourt

in order to get to the merits as efficiently as possible, not for any improper purpose."

Pls.' R. 41(d) Mem. at 1.  They also make two other arguments as to why costs and a

stay are not appropriate here.  First, they assert that this Motion is duplicative of the

pending section 1927 sanctions motion in the Illinois Action, thus giving defendants "a

second bite at the apple in this [c]ourt."  <u>Id.</u>  Second, they cite what they claim is

defendants' bad conduct throughout the course of the other five actions related to this

lawsuit to argue that an award of costs and fees here "would reward [d]efendants for

their repeated tactics of delay and vexatious multiplication of litigation."  <u>Id.</u> at 3.  None

of these three arguments are persuasive in this case.

      As an initial matter, plaintiffs' claim that defendants engaged "in delay and

vexatious conduct" simply for raising jurisdictional objections and otherwise mounting a

vigorous defense in the Illinois Action strains credibility.  Id. at 5-9.  This court need not

weigh in on the merits of the arguments raised by these parties in that action; suffice it

to say that, after a careful review of their Memoranda related to the Motion to Dismiss in

that case, this court concludes that defendants' arguments regarding personal

jurisdiction were hardly frivolous.[7]  See, e.g., Defs.' Mem. of Law. In Supp. of Their Mot.

to Dismiss Am. Verified Compl. at 6-12, N.D. Ill. Action (N.D. Ill. Jan. 4, 2021) (Doc. No.

41).  Plaintiffs' attempts to cast such a routine, commonplace jurisdictional objection as

"vexatious conduct" is hyperbole at best.

Nor does the rest of plaintiffs' first argument – that in the face of this conduct,

they dismissed the Illinois Action and filed it here to "promote[ ] judicial economy" – fare

much better.  Pls.' R. 41(d) Mem. at 14-17.  Put simply, this ignores their decision to file

the case in Illinois in the first place, a decision that Judge Seeger indicated was

premised on a "flimsy" jurisdictional basis and was "perhaps gratuitous."  Defs.' Ex. 1,

Minute Entry.  In this way, plaintiffs' conduct stands in stark contrast to that of the

plaintiff in the main case they rely on, Spinner Consulting LLC v. Stone Point Capital LL,

No. 3:19-CV-1341, 2020 WL 5810438 (D. Conn. Sept. 30, 2020).  There, the plaintiff

already had a pending lawsuit in New Jersey, and thus initially brought its claim against

Stone Point there as well in a separate suit based on the same injury alleged in the first

suit.  Spinner Consulting, 2020 WL 5810438, at *1.  After the first action was dismissed

and Stone Point raised jurisdictional objections in New Jersey, Spinner voluntarily

dismissed the case and refiled it in Connecticut.  Id.  Crucially though, in declining to

---

[7] Indeed, in denying defendants' Motion for Sanctions, Judge Seeger noted that the lawsuit's "connection to [Illinois] seem[ed] attenuated at best", and that plaintiffs' "lawsuit (in [their] backyard, far away from the Connecticut store) as perhaps gratuitous."  Defs.' Ex. 1, Minute Entry at 1.

award the defendant costs under Rule 41(d), Judge Arterton noted that the plaintiff's original basis for filing in New Jersey and consolidating the cases before the same Judge was sound: that "efficiency basis . . . however, was no longer applicable when" the Motion to Dismiss the first case was granted.  Id. at 2.  In those circumstances, the judicial economy was best preserved by "dismissing the Second New Jersey Action and refiling it in [Connecticut] . . . [where] the parties [could] direct their resources to litigating the merits of the case."  Id.

Plaintiffs here have no such "sound basis" for initially filing this action in Illinois. Id.  Indeed, plaintiffs' decision to file in the Northern District of Illinois – and then to split part of that action off into Cook County state court, before filing it again in New York after it was dismissed, see supra at 12 n. 3 – has played a large part in causing the "litigation between the parties [to] metastasize[ ] and spread across the country."  Defs.' Ex. 1, Minute Entry at 2.  All in all, plaintiffs' actions in pursuing their claims have done the opposite of promoting the judicial economy; they have instead defeated it.

Similarly, neither of plaintiffs' other two arguments have merit.  Now that Judge Seeger has denied defendants' Motion for Sanctions, defendants have only one "bite at the apple", so to speak.  Pls.' R. 41(d) Mem. at 1.  Moreover, the standard for the two Motions is quite different.  While a section 1927 sanctions motion requires a finding of "bad faith", the court here need not make that finding in order to award costs under Rule 41(d).  Defs.' Ex. 1, Minute Order at 2.  Rather, "[t]here is no requirement in Rule 41(d) or the relevant case law that a defendant must show bad faith on the part of the plaintiff in order to recover costs."  Lombardo, 2018 WL 6727356, at *2 (quoting Loubier, 178 F.R.D. at 22.

The court also concludes that defendants' conduct throughout the course of the Illinois Action and the other lawsuits involving these parties should not prevent it from awarding them costs under Rule 41(d) when costs would otherwise be warranted.  To be sure, the conduct by all the parties here in prior and ongoing litigation has been distasteful.  Reading their Memoranda in this and prior cases leaves the court with the distinct impression that the parties are more intent on inflicting pain on each other than actually litigating their claims on the merits.  Goureau and Menkin's attempt to voluntarily dismiss certain claims without prejudice in the S.D.N.Y. action after the court had already dismissed those claims was particularly egregious.

However, that conduct is not before this court, at least not directly.  Instead, amidst the torrid history between these parties, the court here is faced with the singular question of whether it is appropriate to award defendants costs for the Illinois Action under Rule 41(d).  On that narrow question, the answer is yes.  Plaintiffs initially filed this Action in Illinois and litigated it vigorously, imposing costs on defendants.  They then dismissed it voluntarily pursuant to Rule 41(a)(1)(A)(i) and refiled their claims in this court.  By the plain language of Rule 4(d), that alone gives the court the discretion to require plaintiffs to pay the costs of that action.  Absent a "satisfying explanation for the course of litigation conduct in which [they] engaged" or a showing by plaintiffs that their actions promoted judicial economy, the court concludes that an award of costs is warranted here.  Lombardo, 2018 WL 6727356, at *2.

Finally, the court in its discretion declines to stay proceedings pending plaintiffs' payment of these costs.  The litigation between the parties to this case has been drawn out long enough.  Plaintiffs have also represented that they "will pay any legitimate

costs awarded promptly because they desire to have the merits adjudicated as soon as possible." Pls.' R. 41(d) Mem. at 25. In light of that representation – and because there remain pending discovery disputes in this case that will only further delay the proceedings – the court declines to issue a stay. See Preferred Freezer Services, LLC v. Americold Realty Trust, No. 19-CV-2926, 2020 WL 774132, at *5 (S.D.N.Y. Feb. 18, 2020) ("[g]iven Plaintiff's assurance [of prompt compliance with any payment order], and the fact that this motion has already significantly delayed the adjudication of this case on the merits . . . a stay is inappropriate").

C.    Conclusion

Accordingly, the court grants defendants' Motion for plaintiffs to pay certain costs associated with the Illinois Action, and denies their Motion to stay the proceedings in this court until those costs are paid.

The court does not, however, decide the amount of those costs here. Defendants are ordered to file a Memorandum addressing the appropriate amount of costs within fourteen (14) days from the date of this Ruling. Plaintiffs should then respond within fourteen (14) days of the filing of the defendants' Memorandum. Of course, the court encourages the parties to confer and attempt to come to an agreement absent court intervention on the amount of costs that would be appropriate, but this time schedule will not be altered.

## VI.    MOTION TO DISMISS

Defendants have also moved to dismiss all eleven counts in the Complaint. They argue that, in every count, ML Fashion and ML Retail have failed to state a claim upon which relief can be granted. Defs.' Mot. to Dismiss Mem. at 5-32. They also argue that this court lacks personal jurisdiction over defendant Goureau and that the claims

24

against him should be dismissed pursuant to Rule 12(b)(2) and for improper venue under Rule 12(b)(3).  Id. at 32-40.  The court begins with Goureau's personal jurisdiction and venue arguments, before addressing the other claims in turn.

      A.      Personal Jurisdiction and Venue

      A court must grant a motion to dismiss if it lacks personal jurisdiction over a defendant. Fed. R. Civ. P. 12(b)(2).  As discussed below, plaintiffs here have alleged facts sufficient to support a plausible claim that this court has jurisdiction over Goureau.  In response, however, defendants have come forward with an Affidavit from Goureau that seeks to refute each of the factual bases for jurisdiction alleged in the Complaint.

      It is well-established that a "[p]laintiff's burden [in establishing personal jurisdiction] is apportioned based on how far the case has progressed." Corning, Inc. v. Shin Etsu Quartz Products Co., Ltd., 242 F.3d 364, 2000 WL 1811067, at *2 (2d Cir. 2000) (citations omitted).  Before discovery, a plaintiff facing a motion to dismiss for lack of personal jurisdiction bears the burden of "mak[ing] a prima facie showing that jurisdiction exists."  SPV Osus Ltd. v. UBS AG, 882 F.3d 333, 342 (2d Cir. 2018).  In other words, "a plaintiff facing a 12(b)(2) motion may defeat the motion by pleading, in good faith, legally sufficient allegations of jurisdiction." Corning, 2000 WL 1811067, at *2 (citations omitted).  At this stage, "[t]he allegations in the complaint must be taken as true to the extent they are uncontroverted by the defendant's affidavits."  Seetransport Wiking Trader Schiffarhtsgesellschaft MBH & Co., Kommanditgesellschaft v. Navimpex Centrala Navala, 989 F.2d 572, 580 (2d Cir. 1993) (internal quotations and citations omitted).  However, "the pleadings and affidavits are to be construed in the light most favorable to plaintiff[s] . . . and all doubts are to be resolved in plaintiff's favor."  IMR

<u>Assocs., Inc. v. C.E. Cabinets, Ltd</u>, No. 06-CV-5965, 2007 WL 1395547, at *2 (E.D.N.Y. May 11, 2007).  Even if plaintiffs make a <u>prima facie</u> showing of personal jurisdiction sufficient to survive a Motion to Dismiss, they still must "eventually . . . establish[ ] [personal jurisdiction] by a preponderance of the evidence . . . at an evidentiary hearing or at trial."  <u>Id.</u> at *2 n. 3 (internal quotations and citations omitted).

To determine whether personal jurisdiction exists "[i]n a federal question case where [the] defendant lives outside the forum state", as Goureau does here, "a federal court applies the forum state's personal jurisdiction rules."  <u>PDK Labs, Inc. v. Friedlander</u>, 103 F.3d 1105, 1108 (2d Cir. 1997).  In Connecticut, courts follow a familiar two-step inquiry in assessing whether they have personal jurisdiction over a defendant.  The "first inquiry [is] whether [Connecticut's] long-arm statute authorizes the exercise of jurisdiction."  <u>Lombard Bros., Inc. v. Gen. Asset Mgmt. Co.</u>, 190 Conn. 245, 250 (1983).  "[I]f [the court] find[s] the statute to be applicable", it then "reach[es] the question [of] whether it would offend due process to assert jurisdiction."  <u>Id.</u>; <u>see also</u> <u>Collins v. Alonso, Andalkar, & Facher, P.C.</u>, No. 3:20-CV—1504, 2021 WL 4477289, at *4 (D. Conn. Sept. 30, 2021).  Due process, in turn, "requires a plaintiff to allege (1) that the defendant has 'certain minimum contacts" with the relevant forum, and (2) that the exercise of jurisdiction is reasonable in the circumstances."  <u>In re Terrorist Attacks on September 11, 2001</u>, 714 F.3d 659, 673 (2d Cir. 2013) (citing <u>Int'l Shoe Co. v. Washington</u>, 326 U.S. 310, 316 (1945)).

When "[d]etermin[ing] whether a defendant has the necessary 'minimum contacts,'" to satisfy due process, courts distinguish "between 'specific' and 'general' personal jurisdiction."  <u>Id.</u> (citing <u>Metro. Life Ins. Co. v. Robertson-Ceco Corp.</u>, 84 F.3d

560, 567-68 (2d Cir. 1996)).  Here, plaintiffs implicitly concede that the court does not

have general personal jurisdiction over Goureau, arguing only that specific personal

jurisdiction exists.  See Pls.' Mem. in Opp'n to Mot. to Dismiss at 35.  "Specific

[personal] jurisdiction exists when a forum exercises personal jurisdiction over a

defendant in a suit arising out of or related to the defendant's contacts with the forum."

In re Terrorist Attacks on September 11, 2001, 714 F.3d at 673-74 (internal quotations

and citations omitted).  To be subject to the jurisdiction of a court under this standard, a

defendant must have "purposefully directed his activities at residents of the forum, and

the litigation [must] result[ ] from alleged injuries that arise out of or relate to those

activities."  Id. (internal quotations and citations omitted).

In this case, plaintiffs allege that Goureau, a resident of Florida, is a member of

ML Fashion.  Compl. at ¶¶ 9; 30.  After ML Fashion stopped selling clothing and other

fashion-related items from the Greenwich store in or about March 2020, the company

tried to retrieve the fixtures, furniture, and equipment that remained in the store.  Id. at ¶

45.  Plaintiffs allege, however, that Goureau called the ML Fashion employee

overseeing the removal of that property and threatened her, to the point where the

employee felt uncomfortable returning to the Greenwich store.  Id.  They also allege

that, as Goureau was negotiating his exit from ML Fashion in early 2020, he made

numerous misrepresentations throughout that process.  Id. at ¶ 58.  According to

plaintiffs, in or about 2020 Goureau also formed Nobelle along with Menkin and

Nagrani, began occupying the Greenwich store, and started competing with ML

Fashion.  Id. at ¶¶ 100-01.  Finally, plaintiffs allege that, on August 4 and 6, 2020, he

accessed the computers belonging to ML Fashion, attempted to install Nobelle software

onto them, and eventually cut off plaintiffs' ability to access those computers remotely. Id. at ¶¶ 153-55.  Contrary to what plaintiffs state in their Memorandum, however, the Complaint alleges itself only that the computers were taken in New York, but at no point says that they were transported to Connecticut.  Compare Pls.' Mem. in Opp'n to Mot. to Dismiss at 36 ("[p]laintiffs also allege that Goureau assisted Nobelle in Connecticut by accessing data in computers that had been physically taken to Connecticut so that Nobelle could utilize that data in Connecticut"),[8] with Compl. at ¶ 144 ("[t]he computers were taken . . . from a locked office in New York not open to the public").

Plaintiffs support these allegations by attaching to the Complaint two sworn Declarations, one from Lemonis and the other from Johnna Griep, the Merchandise Planning Manager for ML Fashion and ML Retail.  See Decl. of Marcus Lemonis, Pls.' Ex. 8 (Doc. No. 1-8); Decl. of Johnna Griep, Pls.' Ex. 9 (Doc. No. 1-9).  Both of these Declarations were prepared for and filed in the Illinois Action and have been refiled as exhibits to the Complaint here.  Yet a careful read of these Declarations reveals that they do not fully support most of the allegations regarding Goureau made in the Complaint.  First, the paragraphs in the Declarations plaintiffs point to in their Memorandum say nothing about the computers in question being transported to Connecticut.  See Pls.' Mem. in Opp'n to Mot. to Dismiss at 38 (citing Decl. of Marcus Lemonis at ¶¶ 7-8, 21-22, 29-32; Decl. of Johnna Griep at ¶¶ 48, 57-61).  Second, rather than clarify Goureau's role in forming Nobelle, the Lemonis Declaration only creates more confusion.  In it, he states that "Menkin and Nagrani started . . . Nobelle",

_____

[8] In support of this claim, plaintiffs cite to paragraphs 153-58, 179, 203, and 205 of the Complaint. These paragraphs do not allege that the computers were transported from New York to Connecticut, although they do allege that they were used to further Nobelle's business.

28

conspicuously leaving Goureau out.  See Decl. of Marcus Lemonis at ¶ 20.  Lemonis

then goes on to aver that "Nobelle's retail location" is the Greenwich store formerly used

by ML Fashion, and that "Menkin and Goureau are using [that store] without permission

from ML Fashion."  Id. at ¶ 21.  The reader is left wondering what, exactly, Goureau's

role is in Nobelle, and Lemonis does not appear to provide further evidence of

Goureau's use of the Greenwich store.  Finally, plaintiffs' support for their allegation that

Goureau threatened the ML Fashion employee over the phone comes in the form of a

hearsay statement in the Griep declaration.  See Decl. of Johnna Griep at ¶ 48 ("[a]n

ML Fashion employee working at my direction . . . received a series of threatening

phone calls from Goureau").

　　　　In contrast, Goureau supports his Motion to Dismiss with an Affidavit specifically

rebutting each of the allegations made against him that would give rise to jurisdiction.

See Aff. of Nicolas Goureau (Doc. No. 33-2).  In it, he denies any connection to

Connecticut; swears he had "no part in either [the] formation or operation of Nobelle",

and he is not "involved in [the company] in any capacity;" denies accessing "any

computer at issue" in August 2020; and avers that at no time did he threaten the ML

Fashion employee on the phone "or do anything even remotely close to that."  Id. at ¶¶

5, 8-9, 11.

　　　　Thus, the court is left in a position where plaintiffs' allegations, taken together,

accepted as true, and without consideration of plaintiffs' Declaration, are sufficient to

plausibly allege personal jurisdiction.[9]  Defendants do not seriously dispute this, and

---

[9] This is because if Goureau did: (1) help form Nobelle, which operates the Greenwich store in
Connecticut; (2) call an ML Fashion employee in Connecticut and threaten her for the purposes of helping
Nobelle keep the fixtures, furniture, and equipment in that store, and; (3) access the computers and cut

instead rely on the sworn Affidavit from Goureau that undermines each of the factual

allegations that would otherwise form the basis for this court's jurisdiction over his

person.  In other words, plaintiffs have made a <u>prima facie</u> case that this court has

personal jurisdiction over Goureau, but Goureau has come forward with admissible

evidence in the form of his Affidavit rebutting that case.  <u>Corning</u>, 242 F.3d 364, 2000

WL 1811067, at *2 ("[p]laintiff may make a prima facie showing solely on the

allegations").  Because the two declarations brought forth by plaintiffs do not fully

support their jurisdictional allegations, this is not a scenario where "the parties [have]

present[ed] conflicting affidavits" and the court must resolve "all factual disputes . . . in

the plaintiff[s'] favor" and find their "<u>prima facie</u> showing [to be] sufficient" to withstand

the Motion to Dismiss "notwithstanding the contrary presentation by the moving party."

<u>Container Leasing Int'l, LLC v. Navicon, S.A.</u>, No. CIV303CV00101, 2006 WL 861012,

at *2 (D. Conn. Mar. 31, 2006).

Faced with this situation,  "[a] district court retains considerable latitude in

devising the procedures it will follow to ferret out the facts pertinent to jurisdiction."

<u>APWU v. Potter</u>, 343 F.3d 619, 627 (2d Cir. 2003) (internal quotations and citations

omitted).  That latitude carries with it a responsibility to "take care to give the plaintiff

off plaintiffs' access to them to advance Nobelle's business, Connecticut's long-arm statute would reach the sum of this activity.  <u>See</u> Conn. Gen. Stat. § 52-59b(a) (providing that a non-resident may be subjected to suit in Connecticut if the individual "[t]ransacts any business within the state . . . commits a tortious act outside the state causing injury to person or property within the state . . . if such person . . . regularly does or solicits business . . . or derives substantial revenue from goods used or consumed or services rendered[ ] in the state . . . or [ ] uses a computer . . . or computer network located within the state").  Moreover, the court could easily conclude that Goureau had "purposefully directed his activities at residents of [Connecticut]", and that the present suit resulted "from alleged injuries that arise out of or relate to those activities" if all three of those things were true.  <u>In re Terrorist Attacks</u>, 714 F.3d at 673-74 (internal quotations and citations omitted).  Such a conclusion would also not offend due process because anyone engaging in such conduct would expect to be sued in Connecticut.  Because the court is ordering jurisdictional discovery here to develop the factual record on each of these issues, it will not speculate as to whether it would have jurisdiction over Goureau if only a subset of these alleged facts were accurate.

ample opportunity to secure and present evidence relevant to the existence of jurisdiction." Id. (internal quotations and citations omitted).  When a defendant has "challenged the factual basis of the court's jurisdiction, the court may not deny the motion to dismiss merely by assuming the truth of the facts alleged by the plaintiff and disputed by the defendant.  Instead, the court must go beyond the pleadings and resolve any disputed issues of fact the resolution of which is necessary to a ruling upon the motion to dismiss."  Phoenix Consulting, Inc. v. Republic of Angola, 216 F.3d 36, 40 (2d Cir. 2000).

The primary tool courts have for resolving such disputes is jurisdictional discovery.  Plaintiffs are "entitled to such discovery . . . only when the allegations are sufficient to articulate a colorable basis for personal jurisdiction, which could be established with further development of the factual record."  Leon v. Shmukler, 992 F. Supp. 2d 179, 195 (E.D.N.Y. 2014).  Because district courts have wide discretion in determining whether jurisdictional discovery is appropriate, "[t]here is no precise standard in the Second Circuit to determine when a plaintiff is entitled to [such] discovery."  Viko v. World Vision, Inc., No. 2:08-CV-221, 2009 WL 2230919, at *16 (D. Vt. July 24, 2009).  While the Circuit has held that a district court "[does] not err in denying discovery [when] plaintiffs [do] no establish a prima facie case . . . [of] jurisdiction", it has also "suggested that district courts may be obligated to order jurisdictional discovery based on a lesser showing [than a prima facie case], in particular when the plaintiff fails to allege legally sufficient facts to establish jurisdiction, but nonetheless asserts specific, non-conclusory facts that, if further developed, could demonstrate substantial state contacts."  Id. (citing Janzini v. Nissan Motor Co., Ltd.,

148 F.3d 181, 186 (2d Cir. 1998); Texas Intern. Magnetics, Inc. v. BASF

Aktiengesellschaft, 31 Fed. App'x 738, 739 (2d Cir. 2002)).

Here, plaintiffs have asserted "specific, non-conclusory facts" that, taken together

and accepted as true, would be sufficient for this court to exercise jurisdiction over

Goureau.  Id.  When that is the case and such a "colorable claim of jurisdiction" has

been made, a court "generally may allow plaintiff[s] to conduct limited discovery with

respect to the jurisdictional issue."  Leon, 992 F. Supp. 2d at 195 (internal quotations

and citations omitted).  This is especially true when, as is the case here, the province of

the facts in dispute lies almost entirely with defendants – it is not clear to this court how,

prior to discovery, plaintiffs would be able to proffer admissible evidence concerning

Goureau's relationship to Nobelle, or anything beyond the screenshots depicted in the

Complaint to show he accessed the computers at issue in this case.  To be sure, ML

Fashion could have brought forth evidence in the form of an Affidavit or Declaration

from its employee who Goureau allegedly threatened, but outside of that piece of

information, "plaintiffs [have not] had ample opportunity to uncover and present

evidence relating to the events bearing on the jurisdictional question."  APWU, 343 F.3d

at 627.

Accordingly, the court in its discretion concludes that jurisdictional discovery is

appropriate here.  The Motion to Dismiss is therefore denied as to defendants' personal

jurisdiction argument related to Goureau, without prejudice to renewing their Motion on

a more developed record.[10]

---

[10] The court will not address Goureau's venue arguments until the matter of personal jurisdiction
is resolved.

B. <u>Lanham Act Claims</u>[11]

Plaintiffs bring two claims here under the Lanham Act. In Count Seven, they allege false advertising in violation of 15 U.S.C. § 1125(a) against all four defendants. Compl. at ¶ 261.  In Count Eight they allege unfair competition against all defendants in violation of the same.  <u>Id.</u> at ¶ 270.[12]  For the following reasons, the Motion to Dismiss is granted as to both of these counts.

      1.     False Advertising

Section 43(a) of the Lanham Act, codified at 15 U.S.C. § 1125(a), provides that:

> (1) Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which--
>
> > (A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person, or
> >
> > (B) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities,
>
> shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

---

[11] The parties dispute whether plaintiffs' Lanham Act claims are subject to the heightened pleading requirement of Rule 9(b).  <u>See</u> Defs.' Mot. to Dismiss Mem. 9-10; Pls.' Mem. in Opp'n to Mot. to Dismiss at 12.  Because the court finds that determining the pleading standard for these two claims is not necessary to resolve the Motion to Dismiss, it does not reach that question.

[12] In both Counts, plaintiffs also allege violations of "Illinois common and statutory law" stemming from the false advertising and unfair competition.  <u>Id.</u> at ¶¶ 261, 270.  The court presumes that this language is a relic of the Illinois Action Complaint accidently left in here, as they cite no Illinois statutes nor do they explain the nexus between these claims and Illinois in the Complaint before this court in their Memorandum.

"Section 1125(a) thus creates two distinct bases of liability: false association, §

1125(a)(1)(A), and false advertising, § 1125(a)(1)(B)." Lexmark Int'l, Inc. v. Static

Control Components, Inc., 572 U.S. 118, 122 (2014).

To state a claim for false advertising under the Lanham Act, plaintiffs must allege

that: "'(1) the defendant has made a false or misleading statement; (2) the false or

misleading statement has actually deceived or has the capacity to deceive a substantial

portion of the intended audience; (3) the deception is material, in that it is likely to

influence purchasing decisions; (4) the defendant placed the false or misleading

statement in interstate commerce; and (5) the plaintiff has been injured as a result of the

misrepresentation, either by direct diversion of sales or by a lessening of goodwill

associated with its products.'" Greenwich Taxi, Inc. v. Uber Technologies, Inc., 123 F.

Supp. 3d 327, 334 (D. Conn. 2015) (quoting Merck Eprova AG v. Gnosis S.p.A., 901 F.

Supp. 2d 436, 449-50 (S.D.N.Y. 2012), aff'd 760 F.3d 247 (2d Cir. 2014)).  Defendants

essentially rest their Motion on "the first two elements" by arguing that "Plaintiffs lack

any false statement at all."  Defs.' Mot. to Dismiss Mem. at 8-9.[13]

"Falsity", the first prong of the test, may be "established by proving that (1) the

advertising is literally false as a factual matter, or (2) although the advertisement is

literally true, it is likely to deceive or confuse customers."  Merck, 760 F.3d at 255

(internal quotations and citations omitted).  To assess "whether an advertisement is

literally false", courts "must analyze the message conveyed in full context", and "must

---

[13] In a short footnote, defendants also state in a conclusory fashion that plaintiffs have failed to
meet the fourth and fifth prongs of the standard.  Id. at 9 n. 6.  Because the court has dismissed plaintiffs'
Lanham Act claims on the first two elements of test, it does not reach the question of whether the fourth
or fifth elements have been met other than to note that internet advertising is plainly interstate commerce.

consider the advertisement in its entirety." Time Warner Cable, Inc. v. DIRECTV, Inc., 497 F.3d 144, 158 (2d Cir. 2007). "[I]n addition to proving falsity, the plaintiff[s] must also show that the defendants misrepresented an inherent quality or characteristic of the product." Merck, 760 F.3d at 255 (internal quotations and citations omitted). "Where an advertising claim is literally false, the court may enjoin the use of the claim without reference to the advertisement's impact on the buying public." Id. at 256 (internal quotations and citations omitted). "And even in cases of implied falsity, where a plaintiff adequately demonstrates that a defendant has intentionally set out to deceive the public, and the defendant's deliberate conduct in this regard is of an egregious nature, a presumption arises that consumers are, in fact, being deceived." Id. (internal quotations and citations omitted) (emphasis in original). "In such a case, once a plaintiff establishes deceptive intent, the burden shifts to the defendant to demonstrate the absence of consumer confusion." Id. (internal quotations and citations omitted).

Here, plaintiffs rest their falsity argument on their allegations that "Defendants have falsely represented . . . that they are selling goods belonging to Nobelle when, in fact, Defendants are selling ML Fashion Inventory, including exclusive, private-label products from brands [like "The Line"] owned by ML Fashion and sold only by ML Fashion and its authorized retailers, without ML Fashion's authorization." Pls.' Mem. in Opp'n to Mot. to Dismiss at 10. Stated more bluntly, they allege that Nobelle stole their goods and started selling them. They do not allege that Nobelle altered the merchandise in any way; instead, the false statement arises from implication, from the fact that Nobelle is selling products that are not theirs to sell and, in the case of "The Line" items, products it does not have the authority to sell.

Plaintiffs' allegations to support the falsity requirement fail for two reasons.  First, as to Nobelle's sale of "The Line" items, a careful reading of the Complaint reveals that plaintiffs have not actually alleged that defendants <u>advertised</u> those items in any way, only that they are <u>selling</u> them from the Greenwich store.  <u>See</u> Compl. at ¶¶ 108-09 (presenting a photo from inside the Nobelle store in Greenwich and alleging that it shows "dozens of colored shirts and sweaters" from "The Line", but failing to allege that Nobelle was advertising "The Line" products in any way).  Because the Complaint is devoid of allegations that defendants were placing advertisements of "The Line" products into interstate commerce – as opposed to simply selling them from their brick-and-mortar location in Connecticut – plaintiffs' false advertising claim as to those products is dismissed.

Second, plaintiffs have also failed to state a false advertising claim upon which relief can be granted as to the remaining, third-party label goods for a different reason: namely, they have failed to point to any case where a court has recognized such a claim that at bottom sounds in conversion or breach of contract as false advertising.  <u>See, e.g.</u>, <u>Tesla Wall Systems, LLC v. Related Cos., L.P.</u>, No. 17-CV-5966, 2017 WL 6507110, at *3 (S.D.N.Y. Dec. 18, 2017) (dismissing a Lanham Act claim where it was "more akin to a conversion claim against [defendant] for misrepresenting to a third-party a right to receive monies allegedly owed to [plaintiff]").  Their Memorandum does not cite a single case in support of their argument that Nobelle advertising and selling merchandise that allegedly belongs to ML Fashion is by itself a false statement.  <u>See</u> Pls.' Mem. in Opp'n to Mot. to Dismiss at 11-12.  As defendants point out, the third-party brands "are neither branded 'Nobelle' nor show any affiliation with the Plaintiffs."  Defs.'

Mot. to Dismiss Mem. at 9.  "In other words, the mere selling of the products does not make any statement, let alone the statement Plaintiffs seek to impermissibly imply – namely, that the goods Nobelle sells 'belong to Nobelle.'"  Id.

Moreover, the case law in this Circuit makes clear that the Lanham Act "imposes no affirmative duty of disclosure" on advertisers, and that "a claim [generally] cannot be based on the failure to disclose a fact."  Clark Consulting, Inc. v. Fin. Solutions Partners, LLC, No. 05-CV-06296, 2005 WL 3097892, at *3 (S.D.N.Y. Nov. 17, 2005); see also id. at *5 (rejecting part of a false advertising claim based on a "fail[ure] to disclose to [ ] customers relevant information regarding" certain products because "the Act imposes no affirmative duty of disclosure"); McNeilab, Inc. v. Am. Home Prods. Corp., 501 F. Supp. 517, 532 (S.D.N.Y. 1980) ("a failure to inform consumers of something, even something that they should know, is not per se a misrepresentation actionable under section 43(a) of the Lanham Act").

The exception to this general rule is if the omission in question "render[s] affirmative statements" that the advertiser has made "false or misleading."  Casper Sleep, Inc. v. Mitcham, 204 F. Supp. 3d 632, 638 (S.D.N.Y. 2016).  However, in these circumstances, "plaintiff[s] must point to such [affirmative] statements if [their] claim is to survive."  Id.  Here, plaintiffs' false advertising allegations fall short of the bar.  Not only is their claim based on an omission – a failure by Nobelle to tell consumers the goods it is selling are owned by ML Fashion – but they also fail to point to any affirmative statement by defendants that this omission renders false or misleading.

For these reasons, the Motion to Dismiss is granted as to plaintiffs' Count Seven false advertising claim under the Lanham Act.

2.      Unfair Competition

Plaintiffs' Lanham Act claim for unfair competition is confusingly pled.  Although "Section 43(a) of the Lanham Act is the basis for several claims that courts and commentators often lump into the broad category of unfair competition claims", plaintiffs will ordinarily plead a specific unfair competition claim under the Lanham Act, rather than unfair competition generally.  See Practice Note, Lanham Act Section 43(a) Claims, Practical Law Intellectual Property & Technology (2022); see also Dastar Corp. v. Twentieth Century Fox Film Corp., 539 U.S. 23, 29 (2003) (stating that, while the Lanham Act was passed to protect "against unfair competition", its "inherently limited wording" means that it "can apply only to [the] certain unfair trade practices [actually] prohibited by its text") (internal quotations and citations omitted).  Plaintiffs' problem is not just that their Complaint that lacks specificity: their Memorandum also blithely states that, "whether [their claim is] called reverse passing off, false association, or false endorsement", it is sufficient to state an unfair competition claim under the Lanham Act, while in the next breath chastising defendants for actually arguing that a reverse passing off claim has not been adequately pled because they "are not actually asserting [such a claim] here."  See Pls.' Mem. in Opp'n to Mot. to Dismiss at 14-15.

Nevertheless, the court must read the allegations in the Complaint in the light most favorable to plaintiffs and, in doing so, reads Count Eight as asserting a type of a false designation of origin claim – reverse passing off.[14]  "Passing off (or palming off, as

---

[14] To the extent that plaintiffs are pleading their unfair competition claim under the two (different) standards they lay out in their Memorandum, see Pls.' Mem. in Opp'n to Mot. to Dismiss at 13, the claim would still fail.  The first standard they articulate is essentially the same as what is required to plead false advertising and would fail for the same reasons articulated in the section dismissing Count Seven, supra Section VI.B.1.  See id. (quoting Lyons P'ship, L.P. v. D&L Amusement & Entm't, 702 F. Supp. 2d 104, 113 (E.D.N.Y. 2010)).  The second standard is for a false association claim, and would also fail for lack of

it is sometimes called) occurs when a producer misrepresents his own goods or services as someone else's. 'Reverse passing off,' as its name implies, is the opposite: The producer misrepresents someone else's goods or services as his own." Dastar Corp., 539 U.S. at 27 n. 1. Stated differently, the prohibition in section 43(a) of the Lanham Act against reverse passing off creates liability where a seller – here, Nobelle – misrepresents the "origin of source or manufacture", as well as the "origin of production." Id. at 29-30.

To state a reverse passing off claim, plaintiffs must plead: "'(1) that the [product] at issue originated with the plaintiff; (2) that [the] origin of the [product] was falsely designated by the defendant; (3) that the false designation of origin was likely to cause consumer confusion; and (4) that the plaintiff was harmed by the defendant's false designation of origin.'" DJ Direct, Inc. v. Margaliot, 512 F. Supp. 3d 396, 414 (E.D.N.Y. 2021) (quoting Societe des Hotels Meridien v. LaSalle Hotel Operating P'ship, L.P., 380 F.3d 126, 131 (2d Cir. 2004)). Key here is the second factor: whether or not defendants "falsely designated" ML Fashion's merchandise. The court concludes that plaintiffs have not plausibly alleged that the defendants did so.

"In order to establish the second element, the plaintiff[s] must allege an affirmative act in which the defendant falsely represented itself as the product's owner or creator." Perkins School for the Blind v. Maxi-Aids, Inc., 274 F. Supp. 2d 319, 324 (E.D.N.Y. 2003). The Supreme Court has stated in dicta that "repackag[ing]" or altering the product in some way can be sufficient to constitute such an affirmative misrepresentation of ownership. Dastar Corp., 539 U.S. at 31 (noting that a reverse

_____

a false statement. Id. (quoting Souza v. Algoo Realty, LLC, No. 3:19-CV-00863, 2020 WL 5300925, at *5 (D. Conn. Sept. 4, 2020)).

passing off claim "would undoubtedly be sustained if [defendant] had bought some of [plaintiff's] videotapes and merely repackaged them as its own").  It is perhaps no surprise, then, that "cases involving a claim for reverse palming off generally" – but not always – "entail the defendant removing the plaintiff's trademark and replacing it with the defendant's own mark."  Id.; see also Societe des Hotels Meridien, 380 F.3d at 131 ("it is precisely the removal of a competitor's trademark from a product that is the hallmark of [a reverse passing off] claim[ ]").[15]  In addition, the Supreme Court has cautioned that "[t]he words of the Lanham Act should not be stretched to cover matters that are typically of no consequence to purchasers."  Dastar Corp., 539 U.S. at 32.  For this reason, at least one court in this Circuit has found that "consumers are unlikely to care who owns the product", provided they are not being deceived in any way about its quality or maker.  DJ Direct, Inc., 512 F. Supp. 3d at 416.  It follows logically that a reverse passing off claim based entirely on disputed ownership of the goods being sold – but devoid of any affirmative false representation or allegation that the product being sold was altered in any way – is insufficient to state a claim.

Such is the case here.  At its core, plaintiffs' reverse passing off claim is premised on the disputed ownership of the goods being sold by defendants.  They do not allege that defendants have altered those products in any way, nor do they allege that defendants have done anything to deceive consumers into thinking that "The Line" or other branded products they are selling are in reality made by Nobelle.  This is not the basis of a reverse passing off claim, which "proscribe[s] misrepresentations about

---

[15] To be sure, having a valid trademark (or common law trademark) is not itself necessary to state a reverse passing off claim.  See DJ Direct, Inc., 512 F. Supp. 3d at 414 n. 8.

who manufactured the product in question."  Gary Friedrich Enterprises, LLC v. Marvel Enterprises, Inc., 713 F. Supp. 2d 215, 234 (S.D.N.Y. 2010).

Accordingly, the Motion to Dismiss is granted as to plaintiffs' Count Eight unfair competition claim brought under the Lanham Act.

C.    Computer Fraud and Abuse Act ("CFAA") Claim

In Count Nine, plaintiffs allege violations of the CFAA, in particular violations of 18 U.S.C. §§ 1030(a)(2)(C), 1030(a)(4), and 1030(a)(5)(A), against all defendants.  See Compl. at ¶¶ 278-87.  These three provisions respectively prohibit: (1) "intentionally access[ing] a computer without authorization or exceed[ing] authorized access, and thereby obtain[ing] information from any protected computer;" (2) "knowingly and with [the] intent to defraud, access[ing] a protected computer without authorization, or exceed[ing] authorized access, and by means of such conduct further[ing] the intended fraud and obtain[ing] anything of value", and; (3) "knowingly caus[ing] the transmission of a program, information, code, or command, and as a result of such conduct, intentionally caus[ing] damage without authorization, to a protected computer."  18 U.S.C. §§ 1030(a)(2)(C), 1030(a)(4), 1030(a)(5)(A).  A civil action for violation of each of these provisions also requires, in the circumstances of this case, "loss to 1 or more persons during any 1-year period . . . aggregating at least $5,000 in value."  18 U.S.C. §§ 1030(c)(4)(A)(i)(I), 1030(g).  The statute goes on to define "loss" in part to mean "any reasonable cost to any victim, including the cost of responding to an offense, conducting a damage assessment, and restoring the data, program, system, or information to its condition prior to the offense."  18 U.S.C. § 1030(e)(11).

Plaintiffs' allegations that defendants violated the CFAA are plainly sufficient to state a plausible claim upon which relief can be granted.  Defendants make two

arguments, neither of which are availing at this stage.  First, they contend that plaintiffs

have not met the statutory requirement of alleging losses of at least $5,000 in value.

See Defs' Mot. to Dismiss Mem. at 12-14.  They contend that this requirement is not

met because "[n]owhere do Plaintiffs allege that Defendants somehow damaged any

information on the computers at issue, which is required to allege cognizable loss under

the statute; rather, all Plaintiffs claim is that Defendants accessed trade secrets that the

computers supposedly contain."  Id. at 14.  This first argument, however, ignores the

fact that plaintiffs have alleged their belief "that Defendants' installation of software on

the computers has damaged or erased existing data on the computers."  Compl. at ¶

174.  Moreover, they also have alleged that they have "spent over $5,000 in employee

time investigating the theft and misuse of the[ ] computers before Defendants severed

their access to the computers and the information thereon."  Id. at ¶ 173.  The statute

itself is clear that "the cost of responding to an offense" and "conducting a damage

assessment" constitutes loss.  18 U.S.C. § 1030(e)(11).  Courts have also made clear

that the meaning of "loss" in this context includes the "cost of investigating or remedying

damage to a computer."  Paul Rudolph Found. V. Paul Rudolph Heritage Found., No.

20-CV-8180, 2021 WL 4482608, at *15 (S.D.N.Y. Sept. 30, 2021) (internal quotations

and citations omitted).  This remains true "even if it turns out that no actual data damage

or interruption of service resulted from the breach."  Id.  Even setting aside here the loss

plaintiffs speculate they will have to incur to repair the damage to the computers – which

they cannot quantify at this point – their allegations that they have spent over $5,000

"investigating the theft and misuse of these computers" is sufficient to plausibly allege

that they have surpassed the loss threshold at this stage.

Defendants' second argument pertains narrowly to plaintiffs' CFAA claim under §

1030(a)(5)(A).  They argue, essentially, that the court should not credit plaintiffs'

allegations regarding damage to the computers since, "[f]or all Plaintiffs know, the data

on the computers remains intact."  Defs.' Mot. to Dismiss Reply at 7.  This ignores the

reality that when "'facts are peculiarly within the possession and control of the

defendant, or where the belief is based on factual information that makes the inference

of culpability plausible,'" a plaintiff's allegations that are "'upon information and belief'" –

as is functionally the case here, although plaintiffs do not use those magic words – may

be sufficient for the purposes of surviving a Motion to Dismiss.  Nielsen v. Leuven, No.

3:15-CV-1154, 2016 WL 1664737, at *2 (D. Conn. Apr. 26, 2016) (quoting Arista

Records LLC v. Doe 3, 604 F.3d 110, 120 (2d Cir. 2010)).

Here, defendants have refused to return the computers to plaintiffs and have cut

off their access to them in the meantime.  Compl. at ¶¶ 143, 173.  Thus, plaintiffs have

no way of knowing whether or not the data on those computers has been damaged.

That being said, the alleged factual foundations upon which they assert that belief

"make[ ] the inference" that the data has been damaged plausible.  Nielson, 2016 WL

1664737, at *2 (internal quotations and citations omitted).  Plaintiffs have alleged that

defendants "improperly seized . . . two computers owned by ML Fashion containing

sensitive, confidential, and trade secret information;" accessed those computers on

multiple occasions; and then attempted to install Nobelle programs on one of the

computers while cutting off ML Fashion's access to both of them.  Compl. at ¶¶ 143,

153-57.  Accepting as true those allegations – which are supported in the Complaint by

screenshots of the alleged access and attempted software installation – plaintiffs have

premised their pleading "on factual information that makes the inference of culpability plausible." Nielson, 2016 WL 1664737, at *2 (internal quotations and citations omitted).

For these reasons, the court concludes that plaintiffs have adequately alleged a claim under the CFAA. The Motion to Dismiss as to Count Nine is therefore denied.

D.    Defend Trade Secrets Act ("DTSA") Claims

Plaintiffs next bring two claims under the DTSA, in Count Ten for misappropriation of trade secrets against all defendants, and in Count Eleven for threatened misappropriation of trade secrets, also against all defendants. Compl. at ¶¶ 288-328. Defendants advance three primary arguments for why both of these claims should be dismissed. First, they argue that plaintiffs' allegations regarding the substance of the data on the computers in question are too vague and nebulous to establish that they qualify as "trade secrets" for the purposes of the statute. Defs.' Mot. to Dismiss Mem. at 15-16. Second, they argue that the computers and the information therein were insufficiently protected, which also "does not suggest the existence of a trade secret." Id. at 16 (internal quotations and citations omitted). Finally, they contend that even if the court were to find that the computers did contain trade secrets, plaintiffs' claims would still fail because they are missing the key ingredient: namely, their Complaint does not allege that those secrets were actually misappropriated, only that they were accessed and possessed.[16] Id. at 18-19.

---

[16] In a footnote, defendants also argue that the DTSA claims in the Complaint rely on improper group pleading, since they fail to differentiate between the conduct of each defendant and are pleaded "against all Defendants" without "so much as mention[ing] an individual defendant within either count." Id. at 15 n. 13. This argument ignores that "context matters in notice pleading." Arias v. East Hartford Police Dept., No. 3:20-CV-00895, 2021 WL 3268846, at *4 (D. Conn. July 30, 2021) (internal quotations and citations omitted). Where a claim involves an action "'that [is] not peculiarly and facially traceable to any one defendant,'" as is the case here, a Complaint that "'refer[s] to all four defendants collectively'" may still be "allowed to proceed because, given the specific circumstances of the case and drawing all

The statute itself defines a "trade secret" with a broad brush.  The term "means all forms and types of financial, business, scientific, technical, economic, or engineering information, including patterns, plans, compilations, program devices, formulas, designs, prototypes, methods, techniques, processes, procedures, programs, or codes, whether tangible or intangible, and whether or how stored, compiled, or memorialized physically, electronically graphically, photographically, or in writing."  18 U.S.C. § 1839(3).  On its face, that definition is quite expansive.  The statute does, however, qualify it in two important ways.  First, in order for information to be considered a trade secret, "the owner thereof" must have "taken reasonable measures to keep such information secret."  18 U.S.C. § 1839(3)(A).  "[T]he information" must also "derive[ ] independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information."  18 U.S.C. § 1839(3)(B).

Taken together, courts in this Circuit have distilled these requirements down into the first prong plaintiffs must satisfy to plead a misappropriation of trade secrets claim under the DTSA: they must first show "the existence of a trade secret, broadly defined as information with independent economic value that the owner has taken reasonable measures to keep secret."  Danping Li v. Gelormino, No. 3:18-CV-442, 2019 WL

---

reasonable inferences in the plaintiff[s'] favor, there [is] an understandable explanation for why the Complaint was not more particularized."  Id. (quoting Bruce Kirby, Inc. v. Quarter Moon, Inc., No. 17-CV-1389, 2018 WL 3614120, at *2 (D. Conn. July 27, 2018).  Here, such an "understandable explanation" exists.  Id.  Plaintiffs have pleaded all facts they appear to have knowledge of related to defendants' access to the computers and the information on them.  However, because they allege that defendants (and Goureau in particular) cut off their access to those computers, it is understandable that their allegations about what defendants did with the data afterwards are pleaded with less specificity.  Compl. at ¶ 155.

1957539, at *8 (D. Conn. May 2, 2019) (internal quotations and citations omitted).

"Although there is no heightened pleading requirement on actions brought under the

DTSA, district courts in this circuit routinely require that plaintiffs plead their trade

secrets with sufficient specificity to inform the defendants of what they are alleged to

have misappropriated." Iacovacci v. Brevet Holdings, LLC, 437 F. Supp. 3d 367, 380

(S.D.N.Y. 2020).  Once the existence of a trade secret has been established, plaintiffs

must also plead the existence of the second prong – actual "misappropriation of that

secret, defined as the knowing improper acquisition and use or disclosure of the secret."

Danping Li, 2019 WL 1957539, at *8 (internal quotations and citations omitted).

    Here, plaintiffs have satisfied both prongs.  First, their descriptions of the

information on the computers in the Complaint is sufficiently particularized for the

purposes of stating a misappropriation of trade secrets claim under the DTSA.  Plaintiffs

allege that the computers contained data regarding "ML Fashion's finances and

performance, as well as the company's books and records."  Compl. at ¶ 148.  Most

importantly, the computers contain "information regarding ML Fashion's profitability

year-over-year; its bills and invoices, including for the products ML Fashion sells at

retail;" and "software on them that allows users to remotely log into ML Fashion's 'point

of sale' or POS system and obtain ML Fashion's customer information."  Id. at ¶¶ 149-

50.  Contrary to what defendants argue, "customer lists can constitute trade secrets."

Gen. Sec., Inc. v. Commercial Fire & Sec., Inc., No. 17-CV-1194, 2018 WL 3118274, at

*4 (E.D.N.Y. June 25, 2018).  So too can "pricing information."  Id. at *5.  And, at this

stage, "trade secrets need not be disclosed in detail in a complaint alleging

misappropriation." <u>Tesla Wall Systems, LLC</u>, 2017 WL 6507110, at *10 (internal quotations and citations omitted).

In addition, plaintiffs allege they took reasonable measures to protect those computers and the data on them.  "There is not a single definition for what constitutes 'reasonable measures', though courts have looked to physical security measures at facilities and confidentiality agreements relating to sensitive information" in making their assessments.  <u>Charles Ramsey Co., Inc. v. Fabtech-NY LLC</u>, No. 1:18-CV-0546, 2020 WL 352614, at *15 (N.D.N.Y. Jan. 21, 2020) (internal quotations and citations omitted).  However, "taking steps to protect information through a confidentiality agreement alone" is not always sufficient "to suggest the existence of a trade secret."  <u>Universal Processing LLC v. Weile Zhuang</u>, No. 17-CV-10210, 2018 WL 4684115, at *3 (S.D.N.Y. Sept. 28, 2018).  Nor does "the fact that the information contained in the trade secrets at issue can be obtained through proper means or retained via casual memory . . . preclude a finding that the information constitutes a trade secret."  <u>Gen. Sec., Inc.</u>, 2018 WL 3118274, at *5.  Given these factors, the actual "secrecy of information is generally a question of fact not to be resolved at the pleadings stage."  <u>Id.</u>

Drawing all inferences in plaintiffs' favor, they have plausibly alleged that they took reasonable measures to protect the information on the computers.  Although defendants are correct to point out that they have not alleged that the specific defendants in this case were required to sign confidentiality agreements, plaintiffs have alleged that they "requir[e] employees, temporary workers, and contractors" to sign such agreements and to maintain the confidentiality of ML Fashion information.  Compl. at ¶ 162.  As to Menkin and Goureau, they have also alleged that they breached their

obligations in the LLC agreement "by utilizing the computers and the information

thereon to operate a business, Nobelle, that is in direct competition with ML Fashion."

Id. at ¶ 177; see also Gen. Sec., Inc., 2018 WL 3118274, at *5 (defendants "have a duty

to maintain secrecy as former employees . . . . Generally, there is an implied duty in

every employment contract not to use trade secrets during employment at a competing

company").  They also have alleged that defendants took the computers "from a locked

office in New York not open to the public."  Compl. at ¶ 144.  Those physical security

measures are another data point indicating that ML Fashion took reasonable measures

to protect the trade secrets it alleges were on the computers.  Thus, because plaintiffs

have plausibly alleged that the information in question met the statutory definition of a

trade secret; had independent economic value; and was protected through reasonable

measures, the court concludes that plaintiffs have sufficiently pleaded the first prong of

the test.

The court also concludes that plaintiffs have plausibly alleged the actual

"misappropriation of that secret, defined as the knowing improper acquisition and use or

disclosure of the secret."[17]  Danping Li, 2019 WL 1957539.  Defendants argue this

---

[17] The court concludes the same as to plaintiffs' threatened misappropriation claim alleged in Count Eleven.  Although the elements of this cause of action pursuant to the still-relatively new DTSA remain underdeveloped both in this Circuit and throughout the country, courts have recognized such a claim where employees have joined a competitor "and refused to ensure [they] would protect [their former employer's] trade secrets."  Jazz Pharmaceuticals, Inc. v. Synchrony Group, LLC, 343 F. Supp. 3d 434, 446 (E.D. Pa. 2018).  One "variation" of this standard, albeit in the context of a state statute, "involves continued retention of the trade secrets under circumstances establishing that the departing employee intends to use or disclose them in the future.  See David Bohrer, Threatened Misappropriation of Trade Secrets: Making a Federal (DTSA) Case Out of It, 33 Santa Clara High Tech. L. J. 506, 532 (2016-17) (citing Cent. Valley Gen. Hosp. v. Smith, 162 Cal. App. 4th 501, 528 (2008)).

The court concludes that the allegations in the Complaint are sufficient to state such a claim here. Plaintiffs allege that "Defendants have threatened to misappropriate Plaintiffs' trade secrets through unlawful means" by accessing the computers containing trade secrets and "refus[ing] to return [them]" when asked.  Compl. at ¶ 322.  Those circumstances are enough to plausibly infer that defendants intend to use the trade secrets in the future.

second prong has not been met because "Plaintiffs improperly conflate <u>misappropriation</u> of confidential information with <u>possession</u> of such information."  Defs.' Mot. to Dismiss Mem. at 18-19 (emphasis in original).  "This argument, however, ignores the Act's complete and disjunctive definition of 'misappropriation.'  That definition includes acquisition of a trade secret of another by improper means <u>or</u> disclosure or use of the trade secret."  <u>AUA Private Equity Partners, LLC v. Soto</u>, No. 1:17-CV-8035, 2018 WL 1684339, at *4 (S.D.N.Y. Apr. 5, 2018) (citing 18 U.S.C. § 1839(5)).  "Disclosure or use is not a required element of misappropriation, but rather an alternative basis for liability under the Act."  <u>Id.</u>  Reading the Complaint in the light most favorable to plaintiffs, they have plausibly alleged "the acquisition [and use] of a trade secret . . . by improper means": namely, that defendants improperly took the computers from a locked office and accessed them to further the business of the competitor they were in the process of starting.  18 U.S.C. § 1839(5)(A).

Accordingly, the Motion to Dismiss is denied as to plaintiffs' Count Ten and Count Eleven DTSA claims.

E.    Conversion

Next, plaintiffs bring six separate state law claims.  Count One alleges conversion against all defendants and is based on them taking the computers, "st[ealing] ML Fashion's Inventory and [fixtures, furniture and equipment in the Greenwich store], and . . . prevent[ing] ML Fashion from utilizing or possessing that Inventory and [store equipment]."  Compl. at ¶ 211.  Defendants promulgate two arguments for why this claim should be dismissed, neither of which is availing.

First, they argue that Connecticut's economic loss doctrine bars this particular conversion claim because it requires plaintiffs in this context to bring suit for breach of contract, not in tort.  Connecticut courts have held, however, that the economic loss doctrine does not apply to conversion.  "Correctly stated, the economic loss doctrine bars <u>negligence</u> claims for commercial losses arising out of the defective performance of contracts.  The economic loss doctrine does not bar all tort claims . . . . Indeed, application of the economic loss doctrine would eliminate the tort of conversion, since the heart of conversion is, in fact, economic loss."  <u>LPP Mortgage Ltd. v. Underwood Towers Limited Partnership</u>, 205 Conn. App. 763, 831-32 (2021) (internal citations and quotations omitted) (emphasis in original).

Second, defendants point to email and text messages attached to the Complaint as exhibits that, in their interpretation, are evidence of Lemonis authorizing Menkin (in the emails) and an unidentified person (in the texts) to take the inventory in question. <u>See</u> Pls.' Ex. 2 at 5-10 (Doc. No. 1-2); Pls.' Ex. 9 at Ex. A (Doc. No. 1-9).  They argue these communications render the allegations in the Complaint regarding the alleged conversion of inventory and equipment implausible, because they show that Lemonis authorized defendants to take the very items plaintiffs now complain that defendants took.  The court disagrees.  Defendants overlook the context for these communications – in one of the emails, Lemonis is simply copied and does not respond.  <u>See</u> Pls.' Ex. 9 at Ex. A.  Even when he does, <u>see</u> Pls.' Ex. 2 at 5-10, it is far from clear that he is authorizing Menkin or the unknown person to actually take the items from ML Fashion for Nobelle's use.  Reading the Complaint and exhibits in the light most favorable to plaintiffs, it is entirely plausible that the "new location" was an ML Fashion store, or that

these communications were sent in the context of broader negotiations about

defendants leaving ML Fashion to start Nobelle, which broke down later on.  Id.  This,

coupled with the allegations in the Complaint, is more than sufficient to state a plausible

claim for relief at this stage, even in the face of the ambiguous communications exhibits.

The Motion to Dismiss is therefore denied as to plaintiffs' Count One conversion

claim.

    F.    Breach of Fiduciary Duty

Defendants move to dismiss plaintiffs' Count Two claim for breach of fiduciary

duty against Menkin and Goureau on the ground that, inter alia, "passive members of a

limited liability company cannot be held liable for breaches of fiduciary duty."  Defs.'

Mot. to Dismiss Mem. at 24.  The parties agree that for LLCs – such as the one here –

formed under the laws of Delaware, there are "'no default fiduciary duties on non-

managing, non-controlling members of [LLCs].'"  Tesla Wall Systems, LLC, 2017 WL

6507110, at *7 (quoting Imbert v. LCM Interest Holding LLC, No. Civ. 7845, 2013 WL

1934563, at *7 (Del. Ch. May 7, 2013)).

The parties disagree as to whether Menkin and Goureau qualify as "managing"

members of the LLC.  Curiously, plaintiffs' own allegations undercut their effort to hold

Menkin and Goureau liable for breach of fiduciary duty.  According to plaintiffs, "Section

6 of the LLC Agreement provides that the management of ML Fashion is 'vested entirely

and exclusively' in the manager of ML Fashion."  Compl. at ¶ 27.  "Section 6.1(b) of the

LLC Agreement", in turn, "provides that the Manager of ML Fashion is Marcus

Lemonis."  Id. at ¶ 28.  Compounding matters, plaintiffs even allege that the LLC

Agreement expressly prohibits Menkin or Goureau from having "any right to participate

51

in the management or control of ML Fashion, or to act for ML Fashion in any way."  Id. at ¶ 29.

Nonetheless, plaintiffs argue that, because Menkin was the President – i.e., an officer – of ML Fashion, she should be considered a managing member.  Pls.' Mem. in Opp'n to Mot. to Dismiss at 26-28.  That argument has no basis in Delaware law, and plaintiffs' very own authorities expressly contradict it.  First, Delaware law defines "manager" under its LLC Act to mean: "a person who is named as a manager of a limited liability company in, or designated as a manager of a limited liability company pursuant to, a limited liability company agreement or similar instrument under which the limited liability company is formed."  6 Del. C. § 18-101(12) (emphasis added).  Thus, by the statute's own terms, managers are defined by contractual designation rather than their eventual role in the LLC.  In addition, plaintiffs cite to Northbound Group, Inc. v. Norvax, Inc., 5 F. Supp. 3d 956, 980 (N.D. Ill. 2013), in support of their argument.  See Pls.' Mem. in Opp'n to Mot. to Dismiss at 26.  However, the court there reasoned:

> It is undisputed that Norvax is the sole "member" of Leadbot, and Norvax and Leadbot have offered nothing that suggests that Mr. Wagner and Mr. McAleer were "managers" of Leadbot.  Leadbot and Norvax have only asserted, at most, that Mr. Wagner and Mr. McAleer were officers and employees of Leadbot.  Thus, Leadbot and Norvax have not mustered evidence that would raise a triable issue regarding whether Mr. Wagner and Mr. McAleer owed a fiduciary duty to them.

Northbound Group, Inc., 5 F. Supp. 3d at 980 (applying Delaware law).  It is for this reason that, in the prior Illinois Action, Judge Seeger found that plaintiffs were unlikely to prevail on the merits of this claim because plaintiffs did not "make the case that Defendants are managing members – if anything, the amended complaint alleges the opposite."  ML Fashion, LLC, 2021 WL 170741, at *9.  The court here concludes the same.

The Motion to Dismiss is therefore granted as to plaintiffs' Count Two breach of fiduciary duty claim.

G.     Breach of Contract

In Count Three, plaintiffs allege breach of contract against Menkin and Goureau. In particular, they allege that "Menkin and Goureau have breached the LLC Agreement by, inter alia, operating a fashion retail business, Nobelle, that is in direct competition with ML Fashion's business."  Compl. at ¶ 228.  Defendants move to dismiss this claim, arguing that: (1) "[p]laintiffs do not explain how a store in Connecticut effectively 'competes' with Plaintiffs' stores located outside of Connecticut"; and, (2) even if there is competition, "the restrictive covenant at issue is just too draconian to be enforced 'as is.'"  Defs.' Mot. to Dismiss Mem. at 28.

Defendants' first argument involves some sleight of hand: one reason that ML Fashion no longer has a store in Connecticut is because, according to its allegations in the Complaint, defendants improperly took over the store it had without its permission. Compl. at ¶¶ 35, 42, 44, 46-48 (alleging that ML Fashion operated a "MARCUS" store at the Greenwich location until March 2020; that it never turned in the keys to the store, advised its landlord that it was leaving, or authorized anyone else to operate in that location; and yet, defendants began operating Nobelle there).  As plaintiffs point out, it is plausible that this "prevents [them] from establishing a new store in that area and taking advantage of the goodwill and customer base created by [their] prior" activities in Greenwich.  Pls.' Mem. in Opp'n to Mot. to Dismiss at 29.  Just as franchisors "have a legitimate business interest in preventing franchisees from . . . abandon[ing] the franchisor and open[ing] a competing business in the same location", LLC members

have a similar interest in ensuring that other members do not do the same.  Flip Flop Shops Franchise Co., LLC v. Neb, No. CV 16-7259, 2016 WL 9275403, at *6 (C.D. Cal. Dec. 5, 2016) (applying Delaware law).  The court therefore disagrees with defendants as to their argument that their actions do not "compete" with ML Fashion.

That being said, the non-compete provision in the LLC Agreement is egregiously overbroad.  Not only does it apply "anywhere in the United States", it also expressly excludes Lemonis, ML Retail, and any other entity controlled by Lemonis from having to abide by its terms.  See Limited Liability Company Agreement of ML Fashion, LLC, Pls.' Ex. 1 at § 7.7.  In Delaware, courts "do not 'mechanically' enforce non-competes."[18]  FP UC Holdings, LLC v. Hamilton, No. 2019-1029, 2020 WL 1492783, at *6 (Del. Ch. Mar. 27, 2020).  "Instead, [they] carefully review the covenants to assure they (1) [are] reasonable in geographic scope and temporal duration, (2) advance a legitimate economic interest of the party seeking its enforcement, and (3) survive a balancing of the equities."  Id. (internal quotations and citations omitted).  If the non-compete clause includes "an obviously overbroad geographic restriction . . . [a] court will readily decline to enforce [that] restriction."[19]  Id.  When a non-compete provision is overbroad, "a court may use its discretion to blue pencil [it] to make its restrictions more reasonable."  Id. at

---

[18] The LLC Agreement includes a Delaware choice of law provision.  See Limited Liability Company Agreement of ML Fashion, LLC, Pls.' Ex. 1 at 28 (Doc. No. 1-1).

[19] Plaintiffs argue that the standard for assessing a non-compete clause is different here because the contract in question is between fellow LLC Members, not between an employer and employee or franchisor and franchisee.  See Pls.' Mem. in Opp'n to Mot. to Dismiss at 31.  They provide zero support for this claim, other than citing to a case from Illinois applying Illinois law that has no relevance here.  Id. (citing GemShares LLC v. Lipton, 2019 WL 3287838, at *2-3 (N.D. Ill. July 21, 2019).  If anything, Delaware law indicates the opposite.  In FP UC Holdings, LLC, the defendant had membership holdings in the LLC, and the court analyzed the non-compete provision he was subject to as it would any other.  FP UC Holdings, LLC, 2020 WL 1492783, at *3, 6-8.  To be sure, however, the non-compete provision in question was not part of the LLC Agreement, but rather was incorporated into a separate contract the defendant had signed at the time he received his membership units.  Id. at *3.

*8.  However, courts may also "exercise[ ] [their] discretion in equity not to allow [a

party] to back away from an overly broad covenant by proposing to enforce it to a lesser

extent than written."  Id. (internal quotations and citations omitted).

Here, the geographic restriction is plainly overbroad.  While Delaware courts

have "enforced non-competes with a nationwide scope", it has only been "in instances

where the competing party agrees, in connection with the sale of a business, to stand

down from competing in the relevant industry . . . anywhere . . . for a stated period of

time after the sale."  Id. (emphasis added).  That is not the case here.  See, e.g., All Pro

Maids, Inc. v. Layton, No. Civ.A. 058, 2004 WL 1878784, at *5, 5 n. 23 (Del. Ch. Aug. 9,

2004), aff'd 880 A.2d 1047 (Del. 2005) (finding a non-compete clause enforceable

where it was "limited to one year and an area defined by specific zip codes where the

majority of [the employers] clients are located", while noting that "[n]on-compete

agreements covering limited areas for two or fewer years generally have been held to

be reasonable").

Still, a court applying Delaware law may, in its discretion, "blue pencil [an] overly

broad non-compete provision to make its restrictions more reasonable."  FP UC

Holdings, LLC, 2020 WL 1492783, at *8; see also Norton Petroleum Corp. v. Cameron,

No. Civ.A. 15212, 1998 WL 118198, at *4 (Del. Ch. Mar. 5, 1998) (blue penciling a non-

compete agreement to change the prohibited area from a 100-mile radius to a 20-mile

radius).  Although Delaware courts have been reluctant to do so in circumstances where

the dispute is between a company and its former employee and there is a clear power

disparity between the two parties, that is not the case here.  See, e.g., Delaware

Elevator, Inc. v. Williams, No. 5596, 2011 WL 1005181, at *11 (Del. Ch. Mar. 16, 2011)

(declining to blue pencil an overly broad non-compete for an employer seeking to enforce the provision against its former employee in part because "[i]t is trite and naïve to suggest that low to mid-level employees freely agree to restrictive covenants"). Moreover, plaintiffs have alleged that Menkin and Goureau not only took over a former ML Fashion store to begin operating Nobelle, but that they did so while they were still members of ML Fashion.  See Pls.' Mem. in Opp'n to Mot. to Dismiss at 32.  Thus, the court concludes that some form of blue penciling is appropriate here to restrict, at minimum, Menkin and Goureau from competing with ML Fashion from the Greewich store while still members of ML Fashion.  The precise contours of how the provision should be redrawn, however, "is a fact-intensive question" that courts are often "not able to resolve" at the Motion to Dismiss stage.  FP UC Holdings, LLC, 2020 WL 1492783, at *8.  The court therefore determines that it cannot further refine the scope of what would constitute a "reasonable" non-compete restriction on the record before it but, because plaintiffs have plausibly alleged that Menkin and Goureau have competed against ML Fashion from the Greenwich store while still members of the LLC, their allegations are sufficient at this stage to state a plausible claim for relief.

The Motion to Dismiss is therefore denied as to plaintiffs' Count Three breach of contract claim.

H.    Fraud

In Count Four, plaintiffs allege fraud against Menkin and Goureau based on their promises not to take "possession, custody, and control" of ML Fashion's merchandise and equipment, which were allegedly "false statements of material fact they knew were false or made with culpable ignorance of their truth or falsity."  Compl. at ¶ 238.  Under

the heightened pleading standard of Rule 9(b), "[a] complaint alleging fraud must ordinarily: '(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent.'" <u>Conn. Gen. Life Ins. Co. v. BioHealth Laboratories, Inc.</u>, No. 3:19-CV-01324, 2021 WL 5447142, at *9 (D. Conn. Nov. 22, 2021) (quoting <u>Rombach v. Chang</u>, 355 F.3d 164, 170 (2d Cir. 2004)).[20]  When alleging fraud against multiple defendants, plaintiffs must "make <u>specific</u> and <u>separate</u> allegations against each defendant."  <u>Id.</u> at *10 (internal quotations and citations omitted).  In addition, "the requisite intent of the alleged speaker of the fraud [need] not be alleged with great specificity . . . for the simple reason that a plaintiff realistically cannot be expected to plead a defendant's actual state of mind."  <u>Id.</u> at *4 (internal quotations and citations omitted).  Still, "[i]n a case involving multiple defendants, plaintiffs must plead circumstances providing a factual basis for scienter for each defendant; guilt by association is impermissible."  <u>Id.</u> at *10 (internal quotations and citations omitted).

Here, the court concludes that plaintiffs have met this standard as to Menkin, but have failed as to Goureau.  The allegations against Menkin are sufficiently specific and particularized to meet the heightened pleading standard of Rule 9(b).  Plaintiffs specify the exact statements – even including exhibits – detailing the allegedly fraudulent statements she made to Lemonis; identify Menkin as the speaker; say the exact date on

---

[20] As plaintiffs correctly point out, Connecticut and Delaware use treat common law fraud similarly.  <u>See</u> Pls.' Mem. in Opp'n to Mot. to Dismiss at 23 n. 6.  Accordingly, the court need not reach the dispute between the parties as to whether Connecticut or Delaware law applies to plaintiffs' fraud claims.

which the statement was made; and explain that the statement was fraudulent because it was "a false statement" she never intended to fulfill that was meant "to fraudulently mislead Lemonis."  Compl. at ¶¶ 56, 58-64.  To be sure, plaintiffs will have to show that Menkin never intended to fulfill these promises at the time they were made, but at the pleading stage plaintiffs are permitted to allege scienter generally, and the sum of the other facts alleged in the Complaint render the allegation that Menkin knew these promises were fraudulent at the time she made them plausible.

In contrast, plaintiffs fail to point to a specific statement from Goureau that was fraudulent, despite also alleging that he "made numerous misrepresentations . . . via email, text message or telephone calls."  Id. at ¶ 58.  Rather, they appear to attempt to lump him into the allegation by relying on specific statements made by Menkin.  See, e.g., Compl. at ¶¶ 60-61.  "Guilt by association", however, is "impermissible" when alleging fraud, and absent allegations specifying the fraudulent statement or statements made by Goureau, the Complaint falls short of meeting Rule 9(b)'s heightened pleading requirement.  Conn. Gen. Life Ins. Co., 2021 WL 5447142, at *10 (internal quotations and citations omitted).

Accordingly, the Motion to Dismiss is denied as to plaintiffs' Count Four fraud claim against Menkin, and granted as to plaintiffs' Count Four fraud claim against Goureau.

I.      Tortious Interference with Noncompetition Agreement

Next, in Count Five, plaintiffs plead tortious interference with the noncompetition agreement against all defendants.  As an initial matter, the court dismisses this claim as to Goureau and Menkin because it is well established that parties to a contract cannot

be held liable for tortiously interfering with that contract.  See, e.g., Kent Literary Club of Weslyan Univ. at Middletown v. Weslyan Univ., 338 Conn. 189, 221 n. 15 (2021) ("a person cannot tortiously interfere with a contractual arrangement, existing or anticipated, to which the person is a party"); Kuroda v. SPJS Holdings, L.L.C., 971 A.2d 872, 884 (Del. Ch. 2009) ("[i]t is well settled that a party to a contract cannot be held liable for breaching the contract and for tortiously interfering with that contract").

The court also dismisses this claim as to Nobelle and Nagrani because plaintiffs have failed to allege that these two defendants acted with the intent to interfere with the non-compete provision of the LLC Agreement, as opposed to merely acting with the knowledge that it existed.  To successfully "'prosecute [a tortious interference] action [plaintiffs] must prove that . . . the defendant was guilty of fraud, misrepresentation, intimidation or molestation . . . or that the defendant acted maliciously.'"  ZeeBaaS, LLC v. Koelewyn, No. 3:11-CV-11, 2012 WL 2327693, at *4 (D. Conn. June 19, 2012) (quoting American Diamond Exchange, Inc. v. Alpert, 101 Conn. App. 83, 90-91 (2007)).  Where there are "no allegations that [a defendant] was guilty of fraud, misrepresentation, intimidation or molestation", and "[p]laintiffs only allege that [the defendant] agreed to collaborate" with a third party in a way that led to a breach of a contract that third-party was a party to, a tortious interference claim is properly dismissed.  Id. at *10.  "The mere knowledge by a new employer of a new employee's non-compete agreement with a former employer is not enough."  Id. (internal quotations and citations omitted).  As to Nagrani and Nobelle, plaintiffs allege only that they had knowledge of the non-compete clause to which Menkin and Goureau were subject.  See Compl. at ¶¶ 247-48.  That is insufficient to state a tortious interference claim.

The Motion to Dismiss is therefore granted as to plaintiffs' Count Five tortious interference with noncompetition agreement claim.

J.     Aiding and Abetting

Finally, plaintiffs also bring a claim for aiding and abetting in Count Six against Menkin, Goureau, and Nagrani.  They allege that all three individual defendants aided and abetted defendant Nobelle in "competing with ML Fashion" and in "breaching the noncompetition provision of the LLC Agreement."  Compl. at ¶¶ 253, 256.  However, as defendants point out, Nobelle was not a party to the LLC Agreement, and therefore the individual defendants could not aid and abet Nobelle in breaching it.  Moreover, neither Delaware nor Connecticut have recognized a claim for aiding and abetting a breach of contract.  See Wenske v. Blue Bell Creameries, Inc., No. 2017-0699, 2018 WL 3337531, at *17 (Del. Ch. Jul. 6, 2018) (Delaware law "does not recognize a claim for aiding and abetting a breach of contract") (internal quotations and citations omitted); Dudrow v. Ernst & Young, LLP, No. X01CV980144211, 1998 WL 800204, at *17 (Conn. Super. Ct. Nov. 4, 1998) (rejecting such a claim); Collins v. Alonso, Andalkar & Facher, P.C., No. 3:20-CV-01504, 2021 WL 4477289, at *9 (D. Conn. Sept. 30, 2021) (citing Connecticut cases to hold that "an aiding and abetting claim must be joined with a valid substantive tort under the law of Connecticut") (emphasis added).

Perhaps realizing this, plaintiffs argue in their Memorandum only that "[t]he underlying tortious conduct can include Lanham Act violations."  Pls.' Mem. in Opp'n to Mot. to Dismiss at 32.  Although defendants dispute that a Lanham Act violation can sustain an aiding and abetting claim attached to it, see Defs.' Reply at 17, the court need not decide that question here.  It has already dismissed the Lanham Act Counts,

60

see supra Section VI.B, and as such plaintiffs' "aiding and abetting claims are supported by no valid underlying . . . cause of action." Collins, 2021 WL 4477289, at *10.

Accordingly, the Motion to Dismiss is granted as to plaintiffs' Count Six aiding and abetting claim.

## VII.   Motion to Stay Discovery and Motion to Amend the Scheduling Order

The third pending Motion the court addresses in this Ruling is defendants' Motion to Stay Discovery "pending the resolution of [their] Motion to Dismiss." Defs.' Mot. to Stay Discovery at 1. Because this Ruling addresses that Motion to Dismiss and defendants' Rule 41(d) Motion, the Motion to Stay Discovery is terminated as moot.

The court also notes that plaintiffs, in opposing the Motion to Stay Discovery, have cross-moved for sanctions against defendants for allegedly failing to confer with them before filing their Motion. See Pls.' Mem. of Law in Opp'n to Defs.' Mot. to Stay Discovery and in Supp. of Request for Sanctions. It also notes that, in its review of the prior litigation history between these parties, each side's conduct leaves much to be desired. Nevertheless, the court declines to issue sanctions at this time.

Finally, the fourth pending Motion addressed in this Ruling – plaintiffs' unopposed Motion to Amend the Scheduling Order by extending all deadlines 120 days – is granted.

## VIII.   CONCLUSION

For the reasons discussed above, the court:

(1) grants defendants' Motion for plaintiffs to pay certain costs associated with the Illinois Action. Defendants are ordered to file a Memorandum addressing the appropriate amount of costs within fourteen (14) days from the date of this Ruling. Plaintiffs should then respond within fourteen (14) days of the filing of the defendants'

Memorandum.  Of course, the court encourages the parties to confer and attempt to come to an agreement absent court intervention on the amount of costs that would be appropriate;

(2) denies defendants' Motion to stay proceedings until those costs are paid;

(3) grants in part and denies in part defendants' Motion to Dismiss.  The Motion to Dismiss is denied as to plaintiffs' claims in Count One (conversion against all defendants); Count Three (breach of contract against Menkin and Goureau); Count Four in part (fraud against Menkin); Count Nine (CFAA violation against all defendants); Count Ten (DTSA misappropriation of trade secrets against all defendants); and Count Eleven (DTSA threatened misappropriation of trade secrets against all defendants). The Motion to Dismiss is granted without prejudice as to plaintiffs' claims in Count Two (breach of fiduciary duty against Menkin and Goureau); Count Four in part (fraud against Goureau); Count Five (tortious interference against all defendants); Count Six (aiding and abetting against Menkin, Goureau, and Nagrani); Count Seven (Lanham Act false advertising against all defendants); and Count Eight (Lanham Act unfair competition against all defendants);

(4) orders jurisdictional discovery as to defendant Goureau.  The Motion to Dismiss is denied as to defendants' personal jurisdiction argument related to Goureau, without prejudice to defendants renewing their Motion on a more developed record;

(5) terminates defendants' Motion to Stay Discovery as moot;

(6) denies plaintiffs' cross-Motion for sanctions, and;

(7) grants plaintiffs' unopposed Motion to Amend the Scheduling Order.

Plaintiffs are granted leave to file an Amended Complaint if they choose to do so. See, e.g., Grullon v. City of New Haven, 720 F.3d 133, 139 (leave to amend a Complaint "generally should be freely granted"); Ruling on Defs.' Mot. for Costs, Fees, and Designation of Pl. as Vexatious Litigant at 25-26, MSP Recovery Claims, Series LLC v. Hartford Fin. Services Group, Inc., et al., No. 3:20-CV-00305 (D. Conn. Mar. 2, 2021) (Doc. No. 47) (acknowledging that when a plaintiff amends a Complaint multiple times; voluntarily dismisses it pursuant to Rule 41; and then brings the same claim in a different district, that case arrives in the new court "in a meaningfully different procedural posture" that offers plaintiffs "the tactical advantage [of] a new docket . . . with respect to obtaining leave to amend", but concluding that it is Rule 41(d), not denying leave to amend, that safeguards against this practice).  The Amended Complaint must be filed within fourteen (14) days of this Ruling.

**SO ORDERED.**

Dated at New Haven, Connecticut this 2nd day of February 2022.

/s/ Janet C. Hall
Janet C. Hall
United States District Judge